862 A.2d 431

**Pedro P. ARRABAL, et al.**

v.

**Tracy CREW–TAYLOR, et al.**

**No. 27, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Dec. 3, 2004.

670

Leslie Hayes Russo (Otway Russo, L.L.P., on brief), Salisbury, for Appellants.

Benjamin Rosenberg (Andrew H. Baida, Mark S. Cohen, Gary A. Wais, on the brief), Baltimore, for Appellees.

Panel: DAVIS, SALMON and SONNER *, JJ.

SALMON, Judge.

On October 17, 1998, Tracy Crew–Taylor entered Harbor Hospital Center in Baltimore. She was expecting triplets, who were at thirty weeks, two days gestation.[1] Her treating physician, Dr. Pedro P. Arrabal, diagnosed Mrs. Crew–Taylor as suffering from gestational diabetes. Mrs. Crew–Taylor delivered two daughters (Cache and Sashe) and a son (Che) on the afternoon of October 19. The two girls were in good physical shape. Che had no pulse when delivered and did not breathe for the first fifteen to twenty minutes afterward. He was revived but thereafter was in a "vegetative state" and suffered from numerous physical problems, including profound hearing loss and blindness. He spent most of his life (fourteen months) in various hospitals and died from his pre-birth injuries on December 6, 1999.

A three-count complaint against Dr. Arrabal and Harbor Hospital Center, Inc., was filed in the Circuit Court for Baltimore City on April 4, 2001. All counts of the complaint alleged that Harbor Hospital Center's agent, Dr. Arrabal, deviated from the applicable standard of care by failing to deliver the triplets immediately upon receipt (on October 18) of test results showing that the fetuses were experiencing distress. Count I, a survivorship action, was filed by Mrs.

---

* Sonner, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

1. Gestation of less than 37 weeks is pre-term.

Crew–Taylor as personal representative of Che's estate. Count II was a wrongful death action filed by Che's father, Charles Taylor, and his mother, Mrs. Crew–Taylor. Count III, captioned "Lack of Informed Consent," also was filed by Che's parents. That count read, in part, as follows:

39. Although the [d]efendants knew and/or in the exercise of reasonable obstetrical and/or perinatology care should have known that Mrs. Taylor and/or Che Taylor's condition was indicative of fetal distress and the need for timely delivery of Mrs. Taylor's triplets, they failed to inform Mr. and Mrs. Taylor of this important fact.

40. Contrary to acceptable standards of obstetrical and/or perinatology care, the [d]efendants failed to timely deliver Mr. and Mrs. Taylor's triplets.

41. By failing to inform Mr. and Mrs. Taylor of Mrs. Taylor and Che Taylor's condition and that diagnostic, EFM and other testing clearly indicated that delivery of her triplets was indicated, the [d]efendants breached their duty to obtain the informed consent of Mr. and Mrs. Taylor prior to commencing their decision to prolong the pregnancy in light of clear signs of fetal distress.

42. The [d]efendants negligently failed to disclose to Mr. and Mrs. Taylor all material information regarding the course of treatment they proposed (prolonging the pregnancy), the risks to Mrs. Taylor and the fetuses of prolonging the pregnancy, the probability of having healthy fetuses if delivery was/is to be performed sooner as opposed to later, and the risks and consequences associated with hypoxia and acidosis should a trial of labor, vaginal delivery and/or prolonging the pregnancy were attempted.

43. Mr. and Mrs. Taylor were not provided with any alternatives to the [d]efendants' proposed treatment of prolonging the pregnancy, in particular earlier delivery of the triplets.

44. If Mr. and Mrs. Taylor, and any reasonable person in their situation, would have been advised of the risks, complications and consequences associated with allowing the

labor and/or pregnancy to progress/continue, they would have withheld their consent to prolonging the pregnancy and would have requested the timely delivery of their triplets.

45. The [d]efendants further failed to inform Mr. and Mrs. Taylor that there was evidence of fetal distress and that more severe and diffuse brain injury increases with the severity and duration of any hypoxic or ischemic event.

46. As a direct result of the [d]efendants' failure to fully inform Mr. and Mrs. Taylor of the true nature of Che Taylor's condition (that it reflected fetal hypoxia and/or asphyxia), and in failing to inform Mr. and Mrs. Taylor of the alternative course of treatment consisting of timely delivering their babies, Mr. and Mrs. Taylor prolonged Mrs. Taylor's pregnancy, resulting in the damages alleged in Paragraphs 29 through 31 and Paragraph 35 of this Complaint.

At the conclusion of a six-day trial, the jury was required to answer several questions. The verdict sheet, as completed by the jury, read:

1. Do you find, by a preponderance of evidence, that the [d]efendant, **PEDRO ARRABAL, M.D.**, breached the standard of care in his care and treatment of [p]laintiffs, **TRACY CREW–TAYLOR** and **CHE TAYLOR?**

 YES _X_ NO ____

If your answer to Question 1 is "YES", proceed to Question 2.

If your answer to Question 1 is "NO", proceed to Question 3.

2. Do you find, by a preponderance of the evidence, that the [d]efendant's, **PEDRO ARRABAL, M.D.**, breach in the standard of care was a proximate cause of an injury to the [p]laintiffs, **TRACY CREW–TAYLOR, CHARLES TAYLOR,** and **CHE TAYLOR?**

 YES _X_ NO ____

Proceed to Question 3.

3. Do you find, by a preponderance of the evidence, that the [d]efendant, **PEDRO ARRABAL, M.D.,** failed to obtain an informed consent from the [p]laintiff, **TRACY CREW–TAYLOR?**

YES _X_ NO _____

If your answer to Question 3 is "YES", proceed to Question 4.

If your answer to Question 3 is "NO", and Question 1 was "NO" stop and inform the Clerk.

If your answer to Question 3 is "NO", and Question 2 was "YES", proceed to Questions 5A, 5B, & 5C.

If your answer to Question 3 is "NO", and Question 2 was "NO", stop and inform the Clerk.

4. Do you find, by a preponderance of the evidence, that the [d]efendant's, **PEDRO ARRABAL, M.D.,** failure to obtain an informed consent from the [p]laintiff, **TRACY CREW–TAYLOR,** was the proximate cause of injuries claimed to have been sustained?

YES _X_ NO _____

*If your answer to Question 4 is "YES", proceed to Question 5B only.*[2]

If your answer to Question 4 is "NO", and Question 1 was "NO", stop and inform the Clerk.

If your answer to Question 4 is "NO", and Question 2 was "YES", proceed to Questions 5A, 5B & 5C.

If your answer to Question 4 is "NO", and Question 2 was "NO", stop and inform the Clerk.

5. In what amount, if any, do you find damages for the Plaintiffs, **TRACY CREW–TAYLOR, CHARLES TAYLOR** and **CHE TAYLOR** for:

A. Claims of the Estate of **CHE TAYLOR:**

Past Medical Expenses $ 636,414.90

---

**2.** The court apparently intended the underlined portion to have read: "If your answers to Questions 2 and 4 are 'yes,' proceed to answer Questions 5A, 5B, and 5C."

| | | |
|---|---|---|
| Funeral Expenses | $ 6,651.00 | |

Non-Economic Damages: (pain and suffering, and other non-pecuniary damages) $ 200,000.00

### B. Claims for **TRACY CREW–TAYLOR**

| | | |
|---|---|---|
| | -0- | /s/LDC |
| Past Medical Expenses | $ ~~636,414.90~~ | 10/24/02 |

Non-Economic Damages: (pain and suffering, mental anguish, and other non-pecuniary damages) $1,400,000.00

### C. Claims for **CHARLES TAYLOR**

Non-Economic Damages: (pain and suffering, mental anguish, and other non-pecuniary damages) $ 150,000.00

| | | |
|---|---|---|
| | 2,393,065.90 | /s/LDC |
| **TOTAL OF DAMAGES** | $ ~~2,036,414.90~~ | 10/24/02 |

Upon review of a post judgment motion filed by the defendants, the trial judge reduced Mrs. Crew–Taylor's non-economic damage award from 1.4 million dollars to $778,837.50 and reduced Charles Taylor's non-economic damages to $83,662.50. These reductions were mandated by Maryland's "cap statute," which is found in Section 11–108(b) of the Courts and Judicial Proceedings Article of the Maryland Code (2002 Repl. Vol.). The court also reduced the award for funeral expenses from $6,651 to $3,500. Except for the aforementioned reductions, the court, in all other respects, denied the defendants' post-trial motions for judgment notwithstanding the verdict and/or new trial and/or to alter or amend the judgment. This appeal followed.

## I. *FACTUAL BACKGROUND*

The appellees presented sufficient evidence, if credited by the jury, to prove that Dr. Arrabal deviated from the appropriate standard of care by failing to deliver the triplets on October 18, 2002.[3] Appellants do not claim otherwise. For

---

3. During the trial of this case, expert witnesses called by the plaintiffs were sharply at odds with those called by the defendants as to whether

that reason, our recitation of the facts developed at trial will be somewhat abbreviated.

Mrs. Crew–Taylor arrived at the outpatient labor and deliver unit of Harbor Hospital Center at approximately 11:00 p.m. on October 17, 1998. She sought treatment because, as to one of the fetuses, she had noticed decreased fetal movement. Personnel in the labor and delivery unit ascertained the heart rates of the three fetuses by electronic fetal monitoring. Findings from that monitoring were "non-reassuring" for each of the triplets. Additionally, Mrs. Crew–Taylor's blood sugar levels were found to be elevated, which showed that she was suffering from gestational diabetes. Gestational diabetes complicates a pregnancy and poses serious risks to both the mother and the fetuses.

Between 8:30 and 10:30 a.m. on October 18, a biophysical profile and Doppler ultrasound were performed on the umbilical cords of each of the triplets. These tests, along with electronic fetal monitoring and fetal movement tests, were administered to determine the well being of each of the fetuses. The biophysical profile for all three fetuses produced scores that were "non-reassuring." Of particular significance, the ultrasound of Che Taylor's umbilical artery showed reverse diastolic flow, which indicated that Che was not getting enough nutrients and oxygen because the blood was flowing away from the placenta.

Dr. Arrabal attributed the non-reassuring test results to the mother's hyperglycemia (high blood sugar). He did not consider the tests' results sufficiently adverse so as to require an immediate delivery of the fetuses, in light of the significant risk attendant to pre-term (prior to thirty-seven weeks) delivery of multiple fetuses. His plan was to continue the mother's insulin therapy and to conduct another biophysical profile the next day. Accordingly, Mrs. Crew–Taylor was injected with intermittent shots of insulin to treat her gestational diabetes.

---

Dr. Arrabal had deviated from the appropriate standard of care in failing to deliver the triplets on October 18, 1998, rather than waiting, as he did, until the afternoon of October 19.

On October 19, at 12:19 p.m., results of another biophysical profile were received. This profile indicated that Che had developed severe bradycardia (reduced heart rate) and agonal heartbeat, which meant that he was almost terminal. Dr. Arrabal ordered an emergency Caesarian section. All three babies were delivered at approximately 12:40 p.m. on October 19. Che was born severely depressed, without a heart rate or a pulse and was "close to dead." He was revived after a long period of cardio-pulmonary resuscitation.

Mrs. Crew–Taylor testified that Dr. Arrabal never informed her that any of the tests that had been administered were non-reassuring. According to her, "the only [t]hing [she] was told was [that] everything was fine," and that she was going to stay in the hospital and be monitored due to the gestational diabetes problem. More specifically, Dr. Arrabal did not discuss with her the risks or benefits of continuing her pregnancy versus immediately delivering the triplets. Dr. Arrabal also did not discuss hypoxia (insufficient oxygen) with her and what could happen to the fetuses if hypoxia was the cause of the non-reassuring test results, nor did he discuss the likely consequences if the hypoxia continued without treatment.

By the time he was sued, Dr. Arrabal had no notes or recollection as to what he had discussed with Mrs. Crew–Taylor in October of 1998 concerning the non-reassuring test results or about what, if anything, he had told the mother regarding the risks associated with continuing the pregnancy.

Dr. David Feisner, an OB/Gyn from Michigan, was called as an expert witness by plaintiffs. He testified that Dr. Arrabal deviated from the standard of care in several respects. In regard to the lack of informed consent claim, he testified that the doctor deviated from the standard of care because

he failed to inform Mrs. Taylor what the situation was. She had numerous tests, all of which have been described as non-reassuring, and that's a situation that she should have been made aware of so that a plan of management could be formulated. Any time any person has a test it's important

to let them know what's going on so that they can be aware that yes, things are okay or things are not okay.

Appellants' expert, Dr. Harold Fox, on cross-examination, agreed with plaintiffs' counsel that, as a general proposition, it is reasonable for a mother to know her status and the status of her fetuses, and to be informed of the probable success of treatment alternatives, when those probabilities can be defined. Another of appellants' experts, Dr. Donald Chambers, testified that Che's parents should have been told that the results of the biophysical profile were non-reassuring.

## II. QUESTIONS PRESENTED

The questions presented by appellants, which we have re-ordered and re-phrased, are as follows:

1. Did the trial court err in submitting appellees' informed consent claim to the jury because lack of informed consent must be predicated on the failure to advise of material risks and medical alternatives in the context of an affirmative treatment affecting the physical integrity of the patient under *Reed v. Campagnolo*, 332 Md. 226, 630 A.2d 1145 (1993), and the continuation of a patient's pregnancy (the failure to deliver) does not qualify as such an affirmative treatment?

2. Assuming, *arguendo*, the trial court did not err in allowing the jury to consider the action for informed consent, whether the trial court nevertheless abused its discretion in restricting cross-examination of Mrs. Crew–Taylor concerning the course she would have taken if Dr. Arrabal had advised her that delivery was an option, and of the risks associated with premature delivery, including long term morbidity?

3. Did the trial court's failure to require the jury to itemize damages for both negligence and informed consent require a new trial because the award to Mrs. Crew–Taylor may have improperly included damages based on informed consent?

680

4. Did the trial court err in submitting to the jury the estate's claim for conscious pain and suffering, instructing on such damages, and including them in the special verdict to be itemized by the jury, because the expert and lay testimony did not establish the consciousness of this fetus/infant and his capacity for pain and suffering?

5. Did the trial court err in submitting the estate's claim for medical expenses to the jury?

6. Even assuming, *arguendo*, that the trial court did not err in submitting the estate's claims for medical expenses to the jury, did the trial court err in restricting appellants' cross-examination of Mrs. Crew–Taylor concerning the payment of those medical expenses and in refusing to modify the jury's award to account for payments made?

7. Did the trial court err in denying appellants' post-trial motions on the grounds that the verdict was excessive, improperly based on sympathy, and the product of confusion and erroneous jury instructions?

## A. *Question 1*

At the conclusion of the entire case, counsel for appellants made a motion for judgment as to the portion of plaintiffs' claim alleging lack of informed consent. Defense counsel maintained that a lack of informed consent action must be predicated "on the failure [of the health care provider] to advise [the patient] of material risks," but that duty applied only when the provider plans to provide affirmative treatment affecting the physical integrity of the patient. Counsel for the movants also contended that, although failing to deliver the triplets on October 18 might (at least arguably) constitute a negligent breach of the expected professional standard of care, failure to explain the pros and cons of taking no immediate action would not suffice to support an action for lack of informed consent. In support of their motion, defendants relied principally on the cases of *Reed v. Campagnolo,* 332 Md.

226, 630 A.2d 1145 (1993), and *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977).

The first case in Maryland to recognize a cause of action for lack of informed consent was *Sard*. Mrs. Sard, who was pregnant for the third time, wanted to deliver her third child but selected sterilization from among the options her doctor gave her in order to fulfill her wish of never becoming pregnant again. 281 Md. at 436, 379 A.2d 1014. While delivering her third child by Caesarian section, Dr. Erving Hardy performed a bilateral tubal ligation. *Id.* After Mrs. Sard became pregnant for the fourth time, she and her husband sued Dr. Hardy, claiming, *inter alia*, that Dr. Hardy had failed to advise them that the surgical procedure was not absolutely certain to prevent future pregnancies. The Sards also alleged that the doctor had failed to discuss with them alternative methods of sterilization. At the close of the Sards' case, the trial court directed a verdict in favor of Dr. Hardy as to all counts. The Court of Appeals reversed and held that the evidence was sufficient to warrant submitting to the jury the question of whether the information withheld by the doctor was material to Mrs. Sard's decision to have the bilateral tubal ligation.

The *Sard* Court said:

[T]he physician's duty to disclose risk information is whether such data will be material to the patient's decision:

"The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is whatever is material to the decision. Thus, the test for determining whether a potential peril must be divulged is its materiality to the patient's decision." *Cobbs v. Grant*, [8 Cal.3d 229,] 104 Cal.Rptr. [505] at 515, 502 P.2d [1] at 11.

By focusing on the patient's *need to obtain information pertinent to the proposed surgery or therapy,* the materiality test promotes the paramount purpose of the informed consent doctrine—to vindicate the patient's right to determine what shall be done with his own body and when.

We hold, therefore, that the scope of the physician's duty to inform is to be measured by the materiality of the information to the decision of the patient. A material risk is one which a physician knows or ought to know would be significant to a reasonable person in the patient's position in *deciding whether or not to submit to a particular medical treatment or procedure.* Whether a physician has fulfilled his duty to disclose, then, is to be determined by reference to a general standard of reasonable conduct and is not measured by a professional standard of care.

*Sard,* 281 Md. at 443–44, 379 A.2d 1014 (citations omitted) (emphasis added).

In *Reed v. Campagnolo,* the Court of Appeals was required to address two certified issues submitted to it by the United States District Court of Maryland. One of the certified issues was:

Whether the continuation of a pregnancy is a decision requiring the informed consent of the patient . . . when the allegedly negligent course of treatment is the defendant physician's failure to inform a pregnancy patient about the availability, risks and benefits of diagnostic testing which might reveal birth defects, and failure to inform the patient about the benefits and risks associated with aborting a severely deformed fetus.

*Reed,* 332 Md. at 228, 630 A.2d 1145.

The *Reed* Court answered the question quoted above in the negative. In *Reed,* it was alleged that the defendants failed in the course of providing pre-natal care to inform the plaintiffs of the existence of, or need for, an α-fetoprotein (AFP) blood test. According to the plaintiffs, administration of the AFP test would have revealed the need for an amniocentesis, which, in turn, would have revealed the extent of the defects of the fetus. Plaintiffs further alleged that they would have chosen to terminate the life of the fetus had they known of the defects. A child was born to the Reeds with very serious abnormalities. *Id.* at 230, 630 A.2d 1145.

Holding that an action for lack of informed consent would not lie under the facts of that case, the *Reed* Court said:

The Reeds, emphasizing that they were not told by the defendants about AFP and amniocentesis tests, say that they lacked informed consent. *But one's informed consent must be to some treatment. Here, the defendants never proposed that the tests be done.* Whether the defendants had a duty to offer or recommend the tests is analyzed in relation to the professional standard of care. Application of that standard may or may not produce a result identical with the informed consent criterion of what reasonable persons, in the same circumstances as the Reeds, would want to know.

*Id.* at 241, 630 A.2d 1145 (emphasis added).

In reaching its decision, the Court noted that in *Sard* the Court spoke "of promoting the paramount purpose of the informed consent doctrine—to vindicate the patient's right to determine what shall be done with his own body and when." *Reed,* 332 Md. at 242, 630 A.2d 1145 (quoting *Sard,* 281 Md. at 444, 379 A.2d 1014).

In *Reed,* the Court ruled that, for the doctrine of informed consent to be applicable, the doctor must fail to explain the pros and cons of some affirmative violation of the patient's physical integrity, such as performing surgery or injecting the patient.

The commentators similarly speak of informed consent in the context of a doctor's affirmative act. *See* F. Harper, E. James & O. Gray, *The Law of Torts* § 17.1, at 562 (2d ed. 1986); W.P. Keeton, *Prosser & Keeton on the Law of Torts* § 32, at 189–90 (5th ed. 1984); M. Shiffman, *Medical Malpractice: Handling General Surgery Cases* § 1.21, at 21–22 (1990); 4 S. Speiser, C. Krause & A. Gans, *The American Law of Torts* § 15:71, at 635 (1987); M. McCafferty & S. Meyer, *Medical Malpractice Bases of Liability,* ch. 11 (1985).

New York courts have held that to state a cause of action in informed consent requires an affirmative act by the

doctor. In *Karlsons v. Guerinot*, 57 A.D.2d 73, 394 N.Y.S.2d 933 (N.Y.App.Div.1977), the plaintiffs contended that the defendant doctors' failure to inform the plaintiffs of the risks involved with the mother's pregnancy, including the risk that she would give birth to a deformed child, gave rise to "a cause of action for failure to obtain an informed consent to continuation of the pregnancy and to the final delivery." *Id.* at 81, 394 N.Y.S.2d at 938. The court held:

> "[A] cause of action based upon [the doctrine of informed consent] *exists only where the injury suffered arises from an affirmative violation of the patient's physical integrity and, where nondisclosure of risks is concerned, these risks are directly related to such affirmative treatment.* Here, the resultant harm did not arise out of any affirmative violation of the mother's physical integrity. Furthermore, the alleged undisclosed risks did not relate to any affirmative treatment but rather to the condition of pregnancy itself. Allegations such as these have traditionally formed the basis of actions in medical malpractice and not informed consent."

*Id.* at 82, 394 N.Y.S.2d at 939 (citation omitted); *see also Keselman v. Kingsboro Medical Group*, 156 A.D.2d 334, 335, 548 N.Y.S.2d 287, 288–89 (1989); *Etkin v. Marcus*, 74 A.D.2d 633, 633, 425 N.Y.S.2d 165, 165–66 (1980).

*Karlsons* was applied to the facts in *Pratt v. University of Minn. Affiliated Hosps. & Clinics*, 414 N.W.2d 399 (Minn. 1987). There parents sought genetic testing because the third of their three children suffered from multiple, congenital abnormalities. The defendants non-negligently advised the parents "that their chance[s] of conceiving another child with birth defects were about the same as parents in general." 414 N.W.2d at 400. Thereafter the plaintiffs had their fourth child who also suffered from birth defects. It was held that there was no liability on a theory of negligent nondisclosure for failure to advise of alternate possible causes of the third child's anomalies so that the parents

"could make an informed decision on whether to conceive another child." *Id.* at 401.

*Reed,* 332 Md. at 242–43, 630 A.2d 1145 (emphasis added).

As can be seen from a review of the portion of Count III quoted *supra,* the gravamen of those allegations was that Dr. Arrabal never obtained Mrs. Crew–Taylor's consent prior to making his decision not to perform an immediate Caesarian section. Just as the defendant in *Reed* never proposed to give a test, here, Dr. Arrabal never proposed to give Mrs. Crew–Taylor an emergency Caesarian section on October 18. Thus, the harm alleged (Che's death) "did not arise out of any affirmative violations of [Mrs. Crew–Taylor's] physical integrity." *Reed,* 332 Md. at 242, 630 A.2d 1145 (quoting *Karlsons v. Guerinot,* 57 A.D.2d 73, 394 N.Y.S.2d 933 (N.Y.App.Div.1977)). Dr. Arrabal's decision to take no affirmative action may have amounted to a violation of the professional standard of care, but he was not obliged to obtain his patient's consent to his non-action.[4] We therefore hold that the trial court erred in denying appellants' motion for judgment as to the lack-of-informed-consent portion of plaintiffs' case.

## B. *Question 2*

The second question assumes that we disagree with appellants' contention that the judge should not have allowed the jury to consider the lack of informed consent theory. Because we agree with appellants in this regard, we need not answer Question 2.

## C. *Question 3*

To succeed on appeal in a civil case, the burden is on the appellant to demonstrate not only that error was committed but to demonstrate, as well, how he or she was prejudiced by that error. *Crane v. Dunn,* 382 Md. 83, 91, 854 A.2d 1180

---

4. It is important to note that appellees do not contend that Mrs. Crew–Taylor suffered harm due to Dr. Arrabal's failure to obtain informed consent prior to administering insulin to her in an effort to control her gestational diabetes.

(2004). Here, the question is not whether the court erred in *admitting evidence* concerning the lack of informed consent issue. That evidence came in without objection. Instead, the error complained about is the trial judge's failure to grant judgment in favor of appellants as to the lack of informed consent theory. The issue becomes: How were the appellants prejudiced by the failure to grant judgment as to the lack-of-informed-consent claim, in light of the fact that the jury found, in answering Questions 1 and 2 on the verdict sheet, that Dr. Arrabal's breach of the standard of care in his treatment of Che and his mother was the proximate cause of an injury to both Che and his mother?

Appellants argue:

Evidence of appellees' claims for negligence and lack of informed consent were inextricably intertwined because both were grounded in Dr. Arrabal's alleged failure to deliver. As such, a new trial is required as to both liability and damages. Further, the trial court's failure to delineate on the special verdict damages for informed consent requires reversal and a new trial on damages because the award to Mrs. Crew[-]Taylor may have improperly included damages for informed consent.

Appellants also make a closely related argument to the one just quoted, i.e., that a new trial is required because "the evidence and testimony adduced at trial in support of the informed consent claim [were] inextricably bound up with the claim for negligence. . . ."

In their reply brief, appellants phrase their contention as follows:

If, as [a]ppellants contend, the issue of informed consent was improperly submitted to the jury, then the entire verdict must fall because it cannot be ascertained to what extent the jury's determination as to negligence was influenced by its conclusions with respect to informed consent.

We disagree with the contention that the issues presented to the jury on the verdict sheet as Questions 1 and 2 (what appellants call the "negligence" claim) were "inextricably in-

tertwined" with Questions 3 and 4 (the lack of informed consent questions) "because both were grounded in Dr. Arrabal's failure to deliver." The informed consent claim was not grounded on a failure to timely deliver the triplets but rather on the theory that Dr. Arrabal had a duty to explain to Mrs. Crew–Taylor on October 18 the pros and cons of not immediately delivering the babies.

The second argument (that a new trial is required because the *testimony* as to the informed-consent theory "was inextricably bound up" with the claim for "negligence") likewise is not persuasive. Our review of the record discloses that the evidence presented concerning Questions 1 and 2 (called the "negligence claim" by appellants) was not inextricably bound up with testimony as to whether Dr. Arrabal had breached his duty to provide informed consent. The expert witnesses testified as to these issues separately.

The argument in appellants' reply brief is based on the implied premise that the jury may have answered Questions 1 and 2 in the affirmative because the jurors believed that Dr. Arrabal was not negligent in delaying delivery for one day but breached his duty to provide informed consent to his patient. The implied premise is illegitimate in light of the answers given to the first four questions on the verdict sheet when read in conjunction with the informed consent instruction given to the jury, *viz:*

> Before providing a specific type or course of medical treatment in a situation where you have a mentally competent adult patient in non-emergent circumstances, a physician has a duty to obtain the consent of the patient after disclosing to the patient: one, the nature of the condition to be treated; two, the nature of the treatment being proposed; three, the probability of success of that treatment; four, the alternatives, if any, to the proposed treatment; and five, every material risk of negative consequences of the treatment being proposed.

> A material risk is a risk that the physician knows or ought to know would be significant to a reasonable person

who is being asked to decide whether to consent to a particular medical procedure or treatment. The purpose of the required explanation is to enable the patient to make an intelligent and informed choice about whether to undergo the treatment being proposed. A physician is liable for any injury caused by the physician's failure to disclose to the patient a material risk.

The jury was instructed separately as to Questions 1 and 2. Under such circumstances, we are not persuaded that the answers to Questions 1 and 2 might have been different had the court not instructed as to informed consent and had withdrawn Questions 3 and 4.

Appellants contend, in the alternative, that at a minimum a new trial as to damages must be ordered because there is no way to determine what non-economic damages were awarded to Mrs. Crew–Taylor as a result of the lack of informed consent count and what non-economic damages were awarded to her due to Dr. Arrabal's negligent delay in delivering the triplets.

Recently, in *Mole v. Jutton,* 381 Md. 27, 38–40, 846 A.2d 1035 (2004), the Court of Appeals made it clear that a claim based on the informed consent doctrine sounds in negligence. Thus, in Count III of their complaint, appellees presented two separate negligence theories to the jury. The first theory was asserted when plaintiffs incorporated by reference into Count III allegations that Dr. Arrabal had deviated from the applicable standard of care by failing to deliver the triplets on October 18 when he first received the "non-reassuring" test results. The second negligence theory set forth in Count III was that Dr. Arrabal had violated Mrs. Crew–Taylor's rights by electing to forego an immediate Caesarian section until October 19 without advising her of the options available (i.e., delivering the babies immediately).

It is oftentimes the case in medical malpractice actions that the plaintiff will have two alternative theories as to why a treating physician is negligent. For example, if a doctor negligently performs an operation and the patient suffers

surgical complications due to that negligence and also performs that operation without the patient's informed consent, the patient may proceed on the two negligence theories simultaneously, *viz:* the theory that plaintiffs suffered injuries because the doctor negligently performed the operation and the alternative theory that, if the defendant had provided the patient with the necessary information prior to surgery, a reasonable patient in the plaintiff's position would have declined the surgery. In the foregoing hypothetical, no matter what theory prevailed, the damages would be the same.

The situation presented in the case at hand is also analogous to one where a plaintiff attempts to prove liability for an automobile accident by contending that the negligent driver was an agent of his parents and contending, in the alternative, that, even if no agency relationship existed, the parents were liable under a theory of negligent entrustment. These are simply two alternative means of proving liability of the parents. But whichever alternative is chosen, the amount of damages will not change.

In the subject case, counsel for the plaintiffs never suggested in their closing arguments that the damages would be any different if liability were founded on the answers to Questions 1 and 2 rather than upon the answers to Questions 3 and 4, which were directed to the lack-of-informed-consent theory.[5] Likewise, the court's instructions contained no such suggestion. Under the lack of informed consent theory, appellees maintained that, if Mrs. Crew–Taylor had been properly informed, a reasonable person in her position would have opted on October 18 to have an immediate Caesarian section. If

---

**5.** Plaintiffs' counsel argued as to Question 4 of the verdict sheet, which dealt with failure to obtain informed consent:

Question number four, did it cause an injury? Of course it caused an injury. The testimony has been from Doctor Peisner and Doctor Pearl, if delivered, even before the bad event on the 19th, these babies would be fine. And any reasonable mom in Ms. Taylor's situation, if told the statistics, the real statistics, and that there is hypoxia, and your babies could be drowning, and all this bad stuff is happening— everything is non-reassuring—would have elected to have that operation. She was expecting to. She was told it was going to come early.

that were sufficient to prove lack of informed consent (it was not), the damages to Mrs. Crew–Taylor (death of her child) would have been identical to those caused by the negligent failure to perform an immediate Caesarian section on October 18. No matter what theory was chosen, the damages to Che's estate and to Che's parents would not have changed.[6] Thus, a new trial is not warranted even though the court erred in submitting the lack-of-informed-consent issue to the jury.

## D. *Question 4*

■ Appellants argue:

The trial court erred in instructing the jury on pain and suffering and itemizing such damages on the special verdict because the testimony did not establish the consciousness of *this* fetus/infant and his capacity for pain and suffering.

Although appellants claim that their counsel objected to certain evidence introduced by the plaintiffs concerning the (alleged) pain and suffering experienced by Che, appellants do not argue that reversible error was committed when the judge made those evidentiary rulings. Instead, according to appellants, reversible error was committed when the trial judge overruled their objection to the verdict sheet, which allowed the estate to recover for Che's conscious pain and suffering. The sole ground for that exception was that, allegedly, there was insufficient evidence to support that claim by the estate.

Dr. David Peisner, one of the plaintiffs' experts, gave the following testimony on direct examination:

---

6. The only judgment received by Che's parents were non-economic damages due to their wrongful death claim. A wrongful death claim arose not from the injury to the child, but from the child's death. Damages for the wrongful death would not change depending on what negligence theory was chosen. Che's estate brought a survivorship action, which derives its name from the fact that, by statute, a right of action for a tort that resulted in the death of the tort victim survives the death of the victim, with the suit being brought by the personal representative of the decedent's estate. In this case, the estate recovered only for funeral expenses and the decedent's pain and suffering. Those damages would not have been any higher or lower regardless as to what negligence theory was adopted.

Q. Doctor, understanding that's your opinion that Dr. Arrabal deviated from the applicable standards of care [by] not timely delivering these babies, do you have an opinion based upon reasonable medical probability what, if any damage or injury occurred to Che Taylor as a result of that delay?

A. Yes.

Q. What is that opinion?

A. In my opinion the babies [sic] suffered hypoxic ischemic encephalopathy, HIE, when the babies' heart rate was [sic] slow for that long period of time prior to the actual delivery.

Q. And, doctor, do you have an opinion based on reasonable medical probability whether Che Taylor suffered any conscious pain and suffering another [sic] or in his mom during this bradycardic event?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

THE WITNESS: Yes.

BY [PLAINTIFFS' COUNSEL]:

Q. What is your opinion?

A. *In my opinion the baby suffered conscious pain and suffering for the reason that newborns have been demonstrated to suffer conscious pain and suffering when something is done for them.* A baby just prior to birth is right around the same time period and when there is a noxious stimulus to the baby, namely the baby is holding its breath, baby basically drowning as you will, then that's conscious pain and suffering as the baby is suffering from those consequences.

Dr. Peisner's opinion came in without a valid objection.[7] And, defense counsel never cross-examined Dr. Peisner re-

---

7. The "do you have an opinion" question was unobjectionable. *See Pepper v. Johns Hopkins,* 111 Md.App. 49, 78–79, 680 A.2d 532 (1996), *aff'd sub nom., Johns Hopkins Hosp. v. Pepper,* 346 Md. 679, 697 A.2d

garding his conscious-pain-and-suffering opinion, nor did defense counsel move to strike that testimony. We hold that Dr. Peisner's testimony, standing alone, was sufficient to present a jury issue as to whether Che suffered conscious pain and suffering.

■ Appellants also contend that the opinions of plaintiffs' expert regarding Che's conscious pain and suffering had an insufficient factual basis. That, however, was not the objection raised at the trial level. At trial, the appellants' argument was that the estate had presented no evidence that Che suffered conscious pain and suffering. Therefore, even if we were to assume, purely for argument sake, that an adequate basis was not set forth by the plaintiffs' expert, that argument was not preserved.

### E. *Questions 5 and 6*

■ As mentioned earlier, the jury awarded Che's estate $636,414.90 for "past medical expenses." Neither of Che's parents were awarded monies for past medical expenses, nor were they awarded anything for economic damages of any sort. Appellants contend that, although it was undisputed that reasonable medical expenses of $636,414.90 were incurred

---

1358 (1997). The "what is your opinion" question was not objected to by appellants' counsel. In *Pepper,* we said:

> First, appellants did not object at the proper time to Dr. Clark's opinion. We quote from the transcript:
> [COUNSEL FOR APPELLEE]: Based on those factors, do you have an opinion today as to what Travis Pepper's life expectancy is today?
> [COUNSEL FOR APPELLANTS]: Objection.
> THE COURT: Overruled.
> THE WITNESS: I do.
> BY [COUNSEL FOR APPELLEE]:
> Q What is that?
> A That it is unlikely that he will live beyond his late teens or 20s.
> The proper time to object would have been to the question that was directed to eliciting the opinion, not the question that was directed to discovering whether the expert had an opinion. *Shpak v. Schertle,* 97 Md.App. 207, 219, 629 A.2d 763, *cert. denied,* 333 Md. 201, 634 A.2d 62 (1993) (holding that objection to question asking expert "do you have an opinion" was properly overruled and that no objection was made to "crucial question, 'what is that opinion' ").

for Che's post birth care, the child's parents had the right to reimbursement for those expenses—not Che's estate. Therefore, appellants maintain that the trial court erred when, over appellants' objection, it allowed the jury to consider whether the estate had incurred medical expenses.

██ Before considering the merits of appellants' position, it is important to remember that under Maryland law, the right to recover the medical expenses incurred by a tortiously injured minor child is ordinarily vested in the minor's parents, not in the minor or his estate. *Garay v. Overholtzer*, 332 Md. 339, 346, 631 A.2d 429 (1993).

The Court said in *Garay:*

It is well settled that when a person negligently injures a minor two separate causes of action arise; the minor child has a cause of action for injuries suffered by it, and the parent or parents of the minor child have a cause of action ... for medical expenses incurred by the parent for the treatment of the minor's injuries.

*Id.* (citations omitted).

██ A parent's cause of action for medical expenses "is not derivative, in a legal sense, from the infant's cause of action, but ... is separate and distinct." *Id.* at 348, 631 A.2d 429 (quoting *Hudson v. Hudson,* 226 Md. 521, 530, 174 A.2d 339 (1961)).

The foregoing principles, as applied to this case, mean that Che's parents had a right to make a claim for $636,414.90 for their son's medical expenses. This was recognized by appellees' counsel when the parents alleged in Count III (by incorporating by reference earlier allegations) that

[t]he expense for Che Taylor's care and treatment has and will remain the responsibility of his parents, Tracy and Charles Taylor, Jr.

And, in Count III, Che's parents, by incorporating certain earlier paragraphs by references, asked for recompense for Che's past medical expenses.

Near the conclusion of the trial, counsel for appellees sought to give the jury a choice, i.e., to allow Che's estate to be reimbursed for Che's medical expenses or, in the alternative, to allow Mrs. Crew–Taylor to make the recovery. Why counsel made that decision is a mystery.

■ Plaintiffs' trial counsel attempted to utilize the third of the *"Garay* exceptions" to the usual rule that a child or his estate has no right to obtain reimbursement for medical expenses incurred as a result of the negligent actions of a tortfeasor. The *Garay* exceptions are:

> [I]f the minor child can show that *he or his estate either has paid or will be individually responsible to pay for medical expenses:* (1) by emancipation, (2) by death or incompetence of his parents, (3) *as necessaries for which his parents are unable or unwilling to pay,* or (4) by operation of a statute, then . . . the minor is entitled to bring a claim for those medical expenses [despite the running of limitations for parental claims].

332 Md. at 374, 631 A.2d 429 (emphasis added).

Mrs. Crew–Taylor testified that Che's medical expenses were $636,414.90 and that she had insurance with "Blue Cross of Maryland" to cover those expenses. She also testified that she had submitted the bills to her insurance company, but she did not know whether her insurer had paid the bills. In addition, she said that she was currently employed as a correctional officer and earned $42,000 per year; her husband makes $15,000–$20,000 annually.

After Mrs. Crew–Taylor testified, counsel for appellees proffered that, if Mrs. Crew–Taylor were recalled as a witness, she would testify that (1) the $636,414.90 bill had been paid by "Blue Cross"; (2) "Blue Cross/Blue Shield" had a lien in the amount of $583,474 "to get them [sic] reimbursed back"; (3) Mrs. Crew–Taylor and her husband "are having financial difficulties" inasmuch as they "are either in bankruptcy or almost in bankruptcy"; and (4) Mrs. Crew–Taylor and her husband "do not have the finances" to pay the $636,414.90 bill. Counsel for appellants accepted the proffer, as did the court,

and all agreed that the facts in the proffer could be utilized by the court in making the legal determination as to whether Che's estate had established a right to recover for past medical expenses. The trial judge ruled that the estate had presented sufficient evidence to prove such a claim.[8]

Except for Che's medical expenses, there was no evidence of any other medical expenses incurred in the subject case. Nevertheless, the jury was asked to determine the amount of "past medical expenses" incurred by Mrs. Crew–Taylor (Question 5B) *and* by Che's estate (Question 5A). The jury foreperson at some point answered 5B by writing down the figure $636,414.90, but that figure was later scratched out and replaced with a zero.

In instructing the jury, the trial court provided *no guidance* as to how the jury should determine whether Mrs. Crew–Taylor or the estate was entitled to recover for the past medical expenses. The trial court simply read the verdict sheet to the jury.

Appellants' counsel did not object to the portion of the verdict sheet concerning the claim of Mrs. Crew–Taylor for recompense for Che's past medical expenses. But defense counsel did object to the verdict sheet's Question 5A; appellants' counsel took the position that Che's estate had not produced sufficient evidence to allow the jury to consider the estate's claim for past medical expenses. Whether defense counsel's position was well taken is controlled by *Johns Hopkins Hospital v. Pepper*, 346 Md. 679, 697 A.2d 1358 (1997).

Travis Pepper was born with severe genetic problems. *Id.* at 684, 697 A.2d 1358. He was taken to Johns Hopkins Hospital ("Hopkins"), where he underwent two surgical procedures. Unfortunately, he met with post-operative complications, which led to severe neurological impairment. *Id.* at 684, 697 A.2d 1358.

Approximately two years after the last of Travis's operations, Travis's parents consulted an attorney concerning a

---

8. The proffer was not read to the jury.

possible malpractice action against Hopkins. Four years after that consultation, Travis's parents, individually and as Travis's next friend, sued Hopkins for medical malpractice. *Id.* at 685, 697 A.2d 1358. Travis's parents' claim for past medical expenses was subsequently dismissed because it was barred by the applicable three-year statute of limitations. *Id.*

Prior to trial, Hopkins filed a *motion in limine* to prevent the plaintiffs from introducing any evidence concerning the medical expenses incurred by Travis or his parents as a result of the (alleged) malpractice. *Id.* at 686, 697 A.2d 1358. Citing the *Garay* case, Hopkins maintained that a claim for pre-majority medical expenses belonged solely to Travis's parents. Because the parents' claim was barred by limitations, Hopkins asserted that no evidence as to medical bills was admissible. *Id.*

The Peppers conceded that a claim for pre-majority expenses ordinarily belongs to the parents of an injured child but pointed to the four exceptions to that rule enunciated in *Garay* and claimed, *inter alia,* that *Garay* Exception 3 (claims for necessaries for which the parents are unable or unwilling to pay) was applicable. The Peppers made a proffer, which included the following representations: (1) their monthly living expenses exceeded their net income by approximately $700; (2) the combined value of their retirement and savings accounts was about $29,000; (3) Travis's medical treatment costs about $177,000 per year, but most of these costs were not covered by insurance; (4) services, which Travis needs, but is not covered by their insurance policy, include physical, occupational, speech, and vision therapy, along with expenses for home health aid; (5) insurance failed to cover 95% of all of medical expenses that plaintiffs' doctors believed, to a reasonable degree of medical certainty, he needed; (6) total lifetime medical expenses would exceed 7.4 million dollars; and (7) Travis's parents were unwilling to provide for Travis's medical expenses if it meant either selling their home to pay for them or tapping into their retirement and savings, which totaled only $29,000.

In *Pepper*, the major issue presented was "whether the minor plaintiff . . . made a sufficient proffer of evidence to have the jury consider his claim for pre-majority medical expenses." *Id.* at 684, 697 A.2d 1358. The court answered that question in the affirmative.

The doctrine of necessaries has long been a feature of Maryland law. *Monumental Bldg. Ass'n. v. Herman*, 33 Md. 128 (1870). It is as much a mechanism to protect minors as it is one to protect those who provide them with necessary services and goods. Generally speaking, minors may avoid contracts entered into by them with adults under the presumption that unequal bargaining power always exists between the two, with the power, and therefore, the potential for overreaching, inuring to the adult. *Monumental Bldg.*, 33 Md. at 131. Those who would use their superior age and intellectual ability to unfairly disadvantage a minor are thus left without legal recourse should they do so, and therefore any incentive to engage in underhandedness. These considerations, however, are typically absent when the minor contracts for "necessaries," variously described as "board, apparel, medical aid, teaching and instruction," and other like needs. *Id.*

*Id.* at 692–93, 697 A.2d 1358.

■ The *Pepper* Court, citing *Garay*, ruled that the doctrine of necessaries could, under certain circumstances, render a child liable for medical services provided to him or her. *Id.* at 693, 697 A.2d 1358. Nevertheless, inasmuch as "parents are presumed and charged by law to provide for a child's necessaries, a contract entered into by a child is presumed to be for non-necessaries, and therefore voidable, and in some cases, void *ab initio.*" *Id.* (citing *Gardner v. Flowers*, 529 S.W.2d 708 (Tenn.1975)). But, "where the parents are financially unable to provide for needed medical care, the presumption fails, and any such treatment is a necessary for which the infant is contractually liable." *Id.*

The *Pepper* Court held:

698

Under Maryland law, parents ... have an obligation under § 5–203(b)(1) of the Family Law Article to provide, *inter alia*, necessary medical care to their minor children, *see* Part II., *supra*, imparting to the parents of an injured child *both a primary responsibility to do so, and a primary right to recover medical expenses from a third-party tort-feasor. But when parents are unwilling or truly unable to pay for such expenses, leaving the child or his or her estate potentially bound in contract, principles of reciprocity demand that the child be given the opportunity to recover those expenses from the wrongdoer. Garay,* 332 Md. at 371, 631 A.2d at 445.

\* \* \*

Despite Hopkins's implicit assertion to the contrary, the doctrine of necessaries was never intended to be a limitation on a child's right to recover medical expenses from the person(s) responsible for causing them. *It is merely an acknowledgment that for certain services, a minor should not be heard to disavow a contract which by personal necessity required his or her participation.* In a case of catastrophic medical injury, we can certainly conceive of a situation where the parents can afford some but not all of the injured child's past, present, and future medical expenses. Assuming limitations has barred parental claims for such, the doctrine of necessaries protects an injured minor's right to recover from a tortfeasor medical *expenses that his or her parents are ill-able to afford and for which he or she ultimately may be liable.* Otherwise, the child would be twice victimized—once at the hands of the tortfeasor, and once by parents who, for whatever reason, failed to timely prosecute their claims for medical expenses. We cannot countenance a result that would leave the only innocent victim in such a transaction uncompensated for his or her injuries and potentially beholden to the compelled generosity of the taxpayer. Public policy and justice demand that an injured minor's right to recover medical expenses in his or her own name after limitations has barred parental

claims begin where the parents' financial ability to provide for medical necessaries ends. That is the rule of *Garay*. *Id.* at 694–95, 697 A.2d 1358 (emphasis added).

The *Pepper* Court concluded as follows:

As we explained in Part III. a., *supra*, and as pointed out by amicus for the Peppers, our holding in *Garay*, was "*simply intended to preclude pre-majority expense claims by the minor to the extent that his or her parents have the means . . . to furnish necessary medical and attendant care but failed to assert their claims against the tortfeasor within the limitations period.*" Whether or not parents are able to afford necessary medical care for their negligently injured minor child will vary from case to case according to the circumstances of the parties involved, including, but not limited to, parental income, existing financial assets and obligations, the number of children in the family, *available insurance coverage,* the cost of living and inflation rate, whether or not both parents work, or are even capable of working in light of the child's injuries, and other economic and non-economic factors too numerous to list. It will also vary, of course, on the nature of the injury and the duration and manner of treatment. These infinitely variable factors preclude a bright line rule concerning the standard by which the affordability determination can be made. More often than not, juries will have to decide with the aid of expert and lay testimony when necessary, whether and to what extent an injured child's medical necessaries exceed the financial ability of the parents. We note however, that as a matter of public policy, government assistance programs are not a factor to be used in making that determination, otherwise the taxpayer would bear a financial burden that rightfully should be borne by the tortfeasor. The same holds true with respect to the often remarkable gratuity of strangers and friends.

*Id.* at 701, 697 A.2d 1358 (emphasis added).

The difference between this case and *Pepper* is that in *Pepper* it was clear from the plaintiffs' proffer that only a

portion of the minor's medical expenses would be paid by insurance. Thus, to the extent that there was no insurance coverage, *Garay* Exception 3 applied. Here, appellees failed to show that one penny of Che's medical expenses would not be covered by the parents' medical insurance.

It is, of course, true that without insurance neither Mrs. Crew–Taylor nor her husband would have been able to afford to pay Che's medical bills. But, as *Pepper* makes clear, the amount of insurance coverage cannot be ignored. *Id.* at 701, 697 A.2d 1358. After Mrs. Crew–Taylor testified that she had submitted her bills to her insurer but did not know if they had been paid, appellees' counsel proffered that the $636,414.90 bill had been paid by "Blue Cross/Blue Shield." Inasmuch as Che's estate failed to prove that Che's parents were unable or unwilling to pay those expenses, the trial court erred in allowing the jury to decide whether the estate was entitled to recover for Che's past medical expenses.

Appellees contend that, if appellants' position prevails, the collateral source rule would be "eviscerated."

> The collateral source rule permits an injured person to recover *the full amount of his or her provable damages,* "regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor."

*Haischer v. CSX Transp., Inc.,* 381 Md. 119, 132, 848 A.2d 620 (emphasis added) (quoting *Motor Vehicle Admin. v. Seidel,* 326 Md. 237, 253, 604 A.2d 473 (1992)).

Here, the collateral source rule, as applied to the estate, is inapplicable because the estate had no provable damages for which it was responsible. As stated earlier, a minor's estate, unless one of the *Garay* exceptions applies, is not liable for medical bills incurred. Because the estate (unlike the parents) was never liable for the expenses, the estate had no right to recover them.[9]

---

9. It must be stressed that this case is highly unusual. Here, the parents sued the appellants to recover the medical expenses and alleged that

 Appellees also contend that appellants have "waived" their argument that the estate cannot recover for the medical expenses. Appellees word this argument as follows:

> Dr. Arrabal's stipulation in the lower court to the fairness and reasonableness of the medical expenses that the jury awarded in the survival action is a sufficient basis for affirming that award. In both of the cases that Dr. Arrabal relies upon in challenging the award, the party opposing the request for an award of medical expenses filed pre-trial motions seeking to dismiss such a claim, *see Garay v. Overholtzer*, 332 Md. 339, 344–45, 631 A.2d 429 (1993), or "to exclude any evidence concerning medical expenses incurred." *Johns Hopkins Hospital v. Pepper*, 346 Md. 679, 686, 697 A.2d 1358 (1997). Dr. Arrabal did not file any such motion but rather stated that he had no objection to admitting into evidence the medical bills that he now argues the jury should not have considered when awarding damages to Che's estate. This argument has thus been waived.

(Reference to joint record extract and transcript omitted.)

Appellants had no grounds for objecting to the medical bills being admitted. In their complaint, the parents made a claim for reimbursement for monies expended for Che's medical bills and that claim was never waived or assigned by the parents.[10] Their objection, which was timely made, was to the verdict sheet, which allowed the estate to recover Che's past

---

they were responsible for those expenses. If the parents had simply asked the jury to evaluate that claim, evidence as to insurance would have been barred by the collateral source rule. But here, the parents and the estate *both* made a claim for the same medical expenses. Such a situation is unlikely to recur. Thus, the collateral source rule will not be undermined by this decision.

10. Some courts have held that the parents can waive or assign to the minor the right to recover medical expenses. *See Garay*, 332 Md. at 361, 631 A.2d 429. Whether this can be done in Maryland has not been decided. *Id.* In any event, appellees never asserted either in the trial court or in this appeal that a waiver or an assignment existed, and in view of the wording of Question 5B and what appellees said in their complaint, it is plain that there was neither a waiver nor an assignment to Che's estate by his parents.

702

medical expenses when the estate failed to prove that Che, as opposed to his parents, was responsible for payment of those expenses. There was no waiver by the appellants.

 Lastly, appellees contend that the third *Garay* exception is applicable, inasmuch as it was proffered below that Blue Cross/Blue Shield had a lien against any recovery in this case. This is so, according to appellees, because it will mean that Che's estate will be responsible for paying the medical expenses, even if we concluded that the estate had no right to such a recovery. In support of that proposition, appellees quote *Garay* as follows:

> [I]f the minor could establish that the medical expenses *were paid from the minor's own estate or that the minor is responsible for pre-majority medical expenses*, then the minor would be able to bring a claim to recover those expenses. 332 Md. at 367, 631 A.2d 429.

(Emphasis added.)

The estate's argument begs the question at issue because it assumes the very issue under debate, i.e., whether the minor is responsible for the payment of the past medical expenses.[11]

In an alternative argument, appellees contend that it would be unfair to reverse the judgment as to the past medical expenses because, if we did so, the estate will receive nothing, inasmuch as "the $583,474 insurance lien far exceeds the remaining jury award to Che's estate of $200,000 in non-economic damages." This argument is entirely speculative. First, nothing in the evidence or the proffer indicated whether the insurer even had a lien against the estate if the estate is denied recovery for past medical expenses. Moreover, even if the lien is against any recovery made by any party to the lawsuits, appellees suggest no reason why the $583,474 lien

---

11. Che's estate did not, of course, establish during trial "that the medical expenses *were* paid by the minor's own estate"; the proof was that the bills *were paid* by Mrs. Crew–Taylor's insurer. Likewise, Che's estate never proved that it was responsible for paying the medical bills. Instead, the parents' allegation in the complaint that they were responsible for paying the medical expenses was never contradicted.

would not be applied against the non-economic recovery by Che's parents, which was in excess of $860,000, rather than as against the estate's $200,000 non-economic recovery.[12]

For the foregoing reasons, we reverse the judgment in favor of Che's estate for past medical expenses. Accordingly, it is unnecessary to address Question 6.

### F. *Question 7*

Appellants argue:

The trial court erred in denying appellants' post-trial motions on the grounds that the verdict was excessive, improperly based on sympathy, and the product of confusion, erroneous jury instructions and a defective verdict form.

■■■ Whether to grant or deny a new trial based on the contention that the verdict was too low or too high is a matter entrusted to the sound discretion of the trial judge. *Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 57–58, 612 A.2d 1294 (1992). In making such decisions, the breadth of the trial judge's discretion is at its broadest. *Id.* at 57, 612 A.2d 1294. *See also Kirkpatrick v. Zimmerman*, 257 Md. 215, 218, 262 A.2d 531 (1970) ("We know of no case where the Court has ever disturbed the exercise of the lower court's discretion in denying a motion for new trial because of the inadequacy or excessiveness of damages.").

As appellants correctly point out, there was a large disparity in the amount of non-economic damages awarded to Che's mother in contrast to the award to his father. Moreover, in view of the evidence, the award of pain and suffering damages to Che's estate was quite generous. Nevertheless, appellants have failed to persuade us that the trial judge abused her very broad discretion in denying appellants' new trial motion on the ground of excessiveness of the jury verdicts.

■■■ The contention that the verdicts were improperly based on sympathy is supported by no argument and there-

---

12. Any unfairness in the outcome (assuming unfairness exists) was a problem of the estate's own making. *See* n. 9, *supra.*

fore is waived. *Beck v. Mangels,* 100 Md.App. 144, 149, 640 A.2d 236 (1994).

■ Appellants argue:

After four hours of deliberation, the jury returned and apparently found that [a]ppellants were liable both for negligence and failure to provide informed consent and apparently awarded non-economic damages ($1.4 million) and medical expenses ($636,414.90) solely to Mrs. Taylor. The trial judge was then required to re-instruct on the special verdict and directed the jury to return to deliberations with respect to the claims of Mr. Taylor and the Estate. Ten minutes later, the jury returned with an award for non-economic damages to the Estate ($200,000.00), and an award of non-economic damages to Mr. Taylor ($150,-000). It apparently crossed out its previous entry of an award of medical expenses to Mrs. Taylor, and entered that amount with respect to the Estate.

The jury's need for re-direction as to the verdict demonstrated its uncertainty about what and to whom damages might be awarded. The haste with which the jury determined to award a total of $350,000 to Mr. Taylor and the Estate also demonstrates that the verdict was not deliberate and driven by other factors.

Initially, the jury returned to the courtroom and answered Questions 1 through 4. The clerk then asked the foreperson:

In what amount, if any, do you find damages for the plaintiffs, Tracy Crew–Taylor, Charles Taylor, and Che Taylor?

Claims of the Estate of Che Taylor. Past medical expenses.

THE FOREPERSON: Excuse me? Where are we?

THE CLERK: Okay. Item Number 5A, Claims of the Estate of Che Taylor.

THE FOREPERSON: It said to go to B.

The foreperson then told the court "there is an error in the direction [on the verdict sheet]." The foreperson was correct.

The verdict sheet said: "If your answer to Question 4 is 'Yes,' proceed to Question 5B only." The verdict sheet should have read, "If your answers to both Questions 2 and 4 are 'Yes,' then answer Questions 5A, 5B, and 5C." After the error was brought to her attention, the judge told the jury to go back in the jury room and answer Questions 5A, B, and C.

It appears to be true that the jury, to some extent at least, was confused by the verdict sheet. But, contrary to appellants' contentions, we have no way of knowing what damages were written on the verdict sheet prior to the point that the jury was sent back into the jury room. Likewise, there is nothing in the record to corroborate appellants' counsel's representation that the interlude between the point where the jury was sent back for more deliberation and the time it returned with its final answers to the questions on the verdict sheet was ten minutes. Finally, there is nothing in the record to support appellants' contention that the ultimate dollar figures that appear on the verdict sheet were the products of jury confusion.[13] Under all these circumstances, we are unconvinced that the trial judge abused her discretion.

**JUDGMENT IN FAVOR OF THE ESTATE OF CHE TAYLOR FOR PAST MEDICAL EXPENSES REVERSED;**

**ALL OTHER JUDGMENTS AFFIRMED;**

**COSTS TO BE PAID 75% BY APPELLANTS AND 25% BY THE ESTATE OF CHE TAYLOR.**

---

13. Appellants also contend that a new trial should have been granted because the trial judge erred in (1) submitting the informed consent issue to the jury; (2) allowing the jury to consider the issue of whether Che suffered conscious pain and suffering; and (3) allowing the jury to make an award to the estate for past medical expenses. Our resolution of the sixth question presented insures that appellants were not prejudiced by the award of past medical expenses to the estate. And, for reasons already set forth, appellants were not prejudiced by allowing the informed consent issue to be considered. Lastly, the court did not err in submitting, for the jury's consideration, the issue of whether Che endured conscious pain and suffering.