976 A.2d 1020

**Dylan McQUITTY, a minor, et al.**

v.

**Donald SPANGLER, et al.**

**No. 137, Sept. Term, 2008.**

Court of Appeals of Maryland.

July 24, 2009.

Reconsideration Denied Aug. 20, 2009.

2

Henry E. Dugan, Jr. (Bruce J. Babij, George S. Tolley, III, Dugan, Babij & Tolley, LLC, Timonium), on brief, for Petitioners.

Denis C. Mitchell, Stein, Mitchell & Muse, LLP, Washington, DC, brief of Amicus Curiae Maryland Ass'n for Justice.

D.C. Offutt, Jr. (Randall L. Saunders, Offutt Nord, PLLC, Huntington, WV, Robert J. Farley, Wharton, Levin, Ehrmantraut & Klein, P.A., Annapolis), on brief, for Respondents.

Albert D. Brault, John F. Brault, Brault Graham, LLC, Rockville, brief of Amici Curiae Medical Mut. Liability Ins. Society of Maryland and Medstar Health, Inc., in support of Appellee, Dr. Spangler.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, BARBERA and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

## BATTAGLIA, J.

In this case we explore the boundaries of the doctrine of informed consent in the context of a healthcare provider's treatment of a patient. Petitioner, Peggy McQuitty, mother of Dylan McQuitty, who was born on May 8, 1995 with severe cerebral palsy, sued Dr. Donald Spangler in the Circuit Court for Baltimore County. In addition to alleging medical malpractice, Ms. McQuitty alleged that he breached his duty to obtain her informed consent to treatment, when he failed to inform her, after she consented to hospitalization and treatment for a partial-placental-abruption,[1] of risks and available alternative treatments related to material changes in her pregnancy, those being a second partial-placental-abruption, oligohydramnios,[2] and intrauterine growth restriction.[3]

---

1. A placental abruption has been described as follows:

   The placenta is a structure that develops in the uterus during pregnancy to nourish the growing baby. If the placenta peels away from the inner wall of the uterus before delivery—either partially or completely—it's known as placental abruption. Placental abruption can deprive the baby of oxygen and nutrients and cause heavy bleeding in the mother. Left untreated, placental abruption puts both mother and baby in jeopardy.

   Placental Abruption—Mayo Clinic.com, http://www.mayoclinic.com/ health/placental-abruption/DS00623 (last visited July 16, 2009).

2. At trial, oligohydramnios was identified as a condition describing significantly low levels of amniotic fluid that can lead to abnormal compression of the umbilical cord, resulting in harm to the fetus. The condition has been described accordingly:

   Oligohydramnios is the condition of having too little amniotic fluid. Doctors can measure the amount of fluid through a few different methods, most commonly through amniotic fluid index (AFI) evaluation or deep pocket measurements. If an AFI shows a fluid level of less than 5 centimeters (or less than the 5th percentile), the absence of a fluid pocket 2–3 cm in depth, or a fluid volume of less than 500mL at 32–36 weeks gestation, then a diagnosis of oligohydramnios would be suspected. About 8% of pregnant women can have low levels of amniotic fluid, with about 4% being diagnosed with oligohydramnios. It can occur at any time during pregnancy, but it is most

**4**

During a trial in April of 2004, a jury returned a verdict in favor of Dr. Spangler on the medical malpractice claim, but could not reach a verdict on the informed consent claim. A second trial, only addressing the informed consent issue, took place in September of 2006, and the jury awarded the McQuittys $13,078,515.00 in damages. Dr. Spangler moved for judgment notwithstanding the verdict, which the trial judge granted, holding that, "it is well established in Maryland that the doctrine of informed consent pertains only to affirmative violations of the patient's physical integrity." The McQuittys appealed to the Court of Special Appeals, which, in an unpublished opinion, affirmed, on the same basis as that relied upon by the trial judge. The McQuittys petitioned this Court for certiorari, which we granted, *McQuitty v. Spangler*, 406 Md. 744, 962 A.2d 370 (2008), to address two questions, which we have reordered:

I. Does an informed consent claim exist under Maryland law in the absence of damages caused by a battery committed by the physician?

II. Does an informed consent claim exist under Maryland law where a physician withholds material information from his patient about changes in her medical status, which would have negated her consent to further delay in operative treatment, causing harm? [4]

---

common during the last trimester. If a woman is past her due date by two weeks or more, she may be at risk for low amniotic fluid levels since fluids can decrease by half once she reaches 42 weeks gestation. Oligohydramnios can cause complications in about 12% of pregnancies that go past 41 weeks.
Low Amniotic Fluid Levels: Oligohydramnios: American Pregnancy Association, http://www.americanpregnancy. org/pregnancycomplications/lowamnioticfluidoligohydra mnios.htm (last visited July 16, 2009).

3. At trial, testimony was elicited explaining that intrauterine growth restriction is a condition by which the fetus's growth is inhibited.

4. Because we conclude that an informed consent claim involves the duty to provide a patient with information material to a decision about whether to undergo or continue a treatment or procedure, including those involving a violation of the patient's physical integrity, we need not address the second question.

We shall hold that an informed consent claim may be asserted by a patient in the absence of a battery or affirmative violation of the patient's physical integrity, because it is the duty of a health care provider to inform a patient of material information, or information that a practitioner "knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure." *Sard v. Hardy,* 281 Md. 432, 444, 379 A.2d 1014, 1022 (1977).

## I. Facts

We adopt the facts set forth by the Court of Special Appeals in its unreported opinion:

Peggy McQuitty was twenty-eight weeks pregnant when admitted to Franklin Square Hospital Center on March 30, 1995. While she was a patient at Franklin Square Hospital, Dr. Spangler, an obstetrician, was her primary attending physician. The physical complaint which brought her to the hospital was vaginal bleeding. Dr. Spangler ordered that an ultrasound be performed. That ultrasound revealed a partial placental abruption, which is a premature separation of the placenta from the uterus. This condition is irreversible and can lead to fetal death. There is no cure or treatment that will restore the function of that tissue once it has become detached from the uterus. And, the greater the extent or degree of placental separation, the greater the reduction of the perfusion of oxygen and nutrients to the fetus and the greater the risk of fetal morbidity.

Given Mrs. McQuitty's prior history of having delivered another child by Cesarean section, coupled with the presence of the partial abruption, Dr. Spangler concluded that Mrs. McQuitty could not safely deliver her child vaginally. He believed that for her to deliver a child at that stage would entail too great a risk that the placenta could separate completely from the uterus during labor, which would cause fetal death. Because Mrs. McQuitty had experienced only a partial abruption and as a consequence a portion of the placenta remained attached to the uterus and was

functioning as of March 30, 1995, Dr. Spangler developed a plan to deliver the baby by Cesarean section at a later date. As part of his plan, Mrs. McQuitty was kept at the hospital from March 30, 1995, until Dylan was delivered thirty-nine days later on May 8, 1995.

The management plan adopted by Dr. Spangler included physically invasive actions, such as establishing intravenous access for the administration of intravenous fluids and medications; serial injections of Betamethasone, a corticosteroid, and other medications; the insertion of a urethral foley catheter for urine collection and analysis; and the performance of serial blood extractions for hematologic studies. After Dr. Spangler formulated the aforementioned plan, the only question was when the delivery would be performed.

The timing of the Cesarean section delivery, and the circumstances under which it would be performed, affected the relative risk to the unborn infant. Delaying an operative Cesarean section increased the risk of further separation of the placenta from the uterine wall, which was not predicable and, according to expert testimony introduced by the plaintiffs, "could occur at any time." Further, abruption of the placenta would leave the fetus with diminished oxygen, and a complete abruption would leave the fetus without a source of oxygen at all, and would lead to almost immediate death.

On the other hand, an immediate delivery by Cesarean section on March 30, 1995, posed a risk of fetal morbidity due to fetal lung immaturity. The risk associated with prematurity, however, would necessarily decrease over time, as the baby matured and as appropriate medical interventions were implemented. In addition, Mrs. McQuitty's pre-existing hypertension, coupled with the partial placental abruption, would tend to "stress" the fetus and accelerate the natural production of fetal surfactant, which over time would reduce the risk of respiratory difficulties associated with prematurity.

Dr. Spangler met with Mr. and Mrs. McQuitty after he diagnosed the partial placental abruption on March 30, 1995,

and informed them that if the placenta continued to separate from the uterus, then the baby would have to be immediately delivered by Cesarean section. Based upon this information from Dr. Spangler, Mr. And Mrs. McQuitty understood that if their son were delivered by immediate Cesarean section on March 30, 1995, he would not likely survive.

The next day, Mrs. McQuitty's condition stabilized with a substantial decrease in the amount of vaginal bleeding. Based upon the information previously provided to her by Dr. Spangler, Mrs. McQuitty consented to Dr. Spangler's management and treatment plan, which was to delay the Cesarean section and otherwise to permit continued administration of intravenous fluids, medicines, etc.

Over the next few weeks, Mrs. McQuitty told Dr. Spangler that she wanted to return home. Dr. Spangler persuaded her not to leave because "there was a very slight possibility that what happened [on March 30, 1995] could happen again," and in light of the fact that the McQuittys lived fifty minutes away, it was important that she stay at the hospital. Mrs. McQuitty was under the impression "that if something happened—even though it wasn't very likely—I was better off being in the hospital because that would—right off the bat they wouldn't have to wait for me to get there for fifty minutes." The plan, according to Mrs. McQuitty, was "barring any emergent situation," they would wait until she was thirty-six weeks along and test to see if Dylan's lungs were mature and then decide what to do.

On April 12, 1995, an ultrasound examination revealed evidence of a new and significant abruption. Although the medical records show that Mrs. McQuitty was informed of the abruption, she testified that she did not remember receiving such information. She testified that she would have remembered being told if she had been advised as to this type of problem with her pregnancy.

On April 28, 1995, another ultrasound revealed the development of an intrauterine growth restriction ("IUGR"). An IUGR develops as a direct result of the decreased perfusion

of nutrients to the developing fetus resulting from an abruption. Fetuses that develop IUGR are at an increased risk for intrauterine fetal death, resulting from inadequate nutrition. The ultrasound examination also revealed that the infant's estimated fetal weight had fallen below the 10th percentile for his gestational age. Mrs. McQuitty acknowledged at trial that Dr. Spangler informed her of the IUGR. She claimed, however, that the explanation provided by Dr. Spangler was inadequate because it left her with the mistaken impression that the test simply revealed that her baby would be small. Accordingly, she believed that she simply needed to eat more and drink milk shakes. Even in light of the latest ultrasound findings Dr. Spangler did not offer Mrs. McQuitty the option of having an immediate Cesarean section on April 28, 1995.

On May 3, 1995, an ultrasound examination revealed a significantly low level of amniotic fluid, a condition known as oligohydramnios. Because amniotic fluids act as a buffer against incidental or abnormal compression of the umbilical cord, a significantly low level of amniotic fluid presents the risk of harm to the fetus. Mrs. McQuitty alleges that Dr. Spangler only told her that the test revealed that the baby was not doing well and that it would be necessary to take her to labor and delivery immediately. Shortly thereafter, however, Dr. Spangler told Mrs. McQuitty that the baby would not be delivered that day and that she was to return to her room and drink plenty of water because her fluid level was low. Mrs. McQuitty asked Dr. Spangler "can't we please just get this baby out?" She then told her doctor, "I have been here for four or five weeks. Everything is apparently fine. I am tired of being here. I want to go home. I want to be with my husband and my daughter. Please take this baby." Dr. Spangler replied that the longer that she could keep the baby, the better off the infant would be.

Mrs. McQuitty experienced a complete abruption on May 8, 1995, requiring an immediate emergency Cesarean section.

At the second trial, the parties entered into the following stipulation:

1) That, the permanent, neurologic injuries suffered by the plaintiff, Dylan McQuitty, resulted solely from his mother's complete abruption which occurred on May 8, 1995.

2) That, Donald Spangler, M.D., did not offer Peggy McQuitty the option or alternative of electively delivering her baby by Cesarean section at any time prior to her complete abruption on May 8, 1995.

3) That, the plan of the Defendant, Donald Spangler, M.D., after Peggy McQuitty was admitted to Franklin Square Hospital on March 30, 1995, was always to deliver her baby by repeat [1] Cesarean section.

  1 The McQuittys' first child was also delivered by Cesarean section.

Testimony introduced by the McQuittys at trial demonstrated that if Dylan had been delivered at any time between April 12, 1995, through the early morning hours of May 8, 1995, then he would have been a normal, healthy baby.

## II.  Procedural History

On September 5, 2001, the McQuittys filed a complaint in the Circuit Court for Baltimore County against Dr. Donald Spangler, Dr. Harrold Elberfeld, the professional association Glowacki, Elberfeld & Spangler, and Franklin Square Hospital.[5]  Against each defendant, the McQuittys alleged one count of medical malpractice and one count of breach of informed consent.[6]  The McQuittys' medical malpractice claim was based on the following allegations, in pertinent part:

5. In March of 2004, the McQuittys and Dr. Elberfeld entered into a settlement, and on the same date, summary judgment was entered in favor of Franklin Square Hospital.

6. The McQuittys made separate complaints of medical malpractice and breach of informed consent against each of the named defendants. Because the factual allegations made against Dr. Spangler are the same as the allegations against the other defendants, only the allegations against Dr. Spangler have been reproduced here.

13. The Defendant, Donald Spangler, M.D., owed to the Plaintiff and to his mother a duty to exercise that degree of care, skill and judgment ordinarily expected of a reasonably competent practitioner of his chosen specialty acting in the same or similar circumstances, which duty included the performance of adequate and proper tests and procedures to determine the nature and severity of the conditions of the Plaintiff and/or his mother; the careful diagnosis of such conditions; the employment of appropriate procedures and treatments to correct such conditions; the continuous evaluation of the effects of such treatments; the adjustment of the course of treatment in response to such evaluations; and the appropriate notification to the Plaintiff's mother, Peggy McQuitty, of the various alternatives and risks involved in various modalities of treatment.

14. On or about October 19, 1994, the Plaintiff's mother, Peggy McQuitty, came under the medical care of the Defendants, Donald Spangler, M.D.; Harrold Elberfeld, M.D. and Drs. Glowacki, Elberfeld & Spangler, P.A., for prenatal obstetrical care and services related to her pregnancy with an estimated date of delivery of June 22, 1995.

15. On or about March 30, 1995, the Plaintiff's mother, Peggy McQuitty, was admitted to Franklin Square Hospital Center, Inc. with vaginal bleeding. The Plaintiff's mother was assessed as having a partial placental abruption.

16. On or about April 12, 1995, the Plaintiff's mother, Peggy McQuitty, submitted to an obstetrical ultrasound which was reported as revealing a "new" abruption.

17. A repeat obstetrical ultrasound performed on or about April 28, 1995 to "rule out IUGR" confirmed a fetal weight of less than the 10th percentile for 32.9 weeks and a gestational age by ultrasound of 29.2 weeks.

18. On or about May 4, 1995, the Defendant, Donald Spangler, M.D. canceled the one hour fetal heart monitoring which the Plaintiff's mother, Peggy McQuitty, was receiving and ordered that she be sent for antepartum testing each Monday and Thursday at 9:00 a.m. for nonstress testing and amniotic fluid index assessment.

19. By May 7, 1995, it was noted that the blood pressure of the Plaintiff's mother, Peggy McQuitty, had risen as high as 160/78 and a repeat of 150/84 despite antihypertension medication. Proteinuria was also noted.

20. On or about May 8, 1995, at 1:50 p.m., the Plaintiff's mother, Peggy McQuitty, noted a pinkish discharge in the toilet. She was placed upon an electronic fetal heart monitor, and a fetal heart rate in the 60's was noted.

21. The Plaintiff's mother, Peggy McQuitty, was taken to the operating room at Franklin Square Hospital Center, Inc. for a stat Cesarean section delivery and the Plaintiff, Dylan McQuitty, was delivered by Cesarean section at or about 2:12 p.m. He was resuscitated in the delivery room and transferred to the Neonatal Intensive Care Unit. The Plaintiff, Dylan McQuitty, remained an inpatient at Franklin Square Hospital Center, Inc. until June 9, 1995.

22. The Plaintiff further alleges that as a result of the inadequate and inappropriate management of the prenatal care of his mother, Peggy McQuitty, by the Defendant, Donald Spangler, M.D., Dylan McQuitty suffered grievous injuries and complications including, but not necessarily limited to, perinatal asphyxia, hypoxic-ischemic encephalopathy, global developmental delay, seizure disorder and permanent and irreversible brain damage.

23. The negligent and careless acts and omissions of the Defendant, Donald Spangler, M.D., individually and through his agents, servants and/or employees, include but are not necessarily limited to the following:

a. Failing to employ adequate diagnostic procedures and tests to determine the nature and severity of the medical status and/or condition(s) of the Plaintiff, Dylan McQuitty, and his mother, Peggy McQuitty;

b. Failing to employ appropriate treatments and procedures to correct such condition(s);

c. Failing to exercise reasonable care in evaluating the effects of any treatments chosen to address or correct such condition(s);

d. Failing to exercise reasonable care in adjusting the chosen course of treatment or care provided to the Plaintiff's mother, Peggy McQuitty, in response to information available or obtained from diagnostic tests or procedures, including, but not limited to, fetal heart monitoring and ultrasound examinations;

e. Failing to communicate or consult with and otherwise obtain the services of a competent perinatologist or neonatologist to provide advice, guidance, care and treatment to the Plaintiff's mother, Peggy McQuitty, and to manage her prenatal care and labor and delivery of the Plaintiff, Dylan McQuitty;

f. Failing to exercise reasonable care in the performance and interpretation of physical examinations, diagnostic tests, ultrasonography and other antenatal surveillance procedures employed during the prenatal care of the Plaintiff's mother, Peggy McQuitty;

g. Failing to deliver the Plaintiff, Dylan McQuitty, in a careful and expeditious fashion;

h. Failing to appropriately and adequately obtain an informed consent from the Plaintiff's mother Peggy McQuitty;

i. Failing to require the physicians and other care providers involved in the care and treatment of the Plaintiff's mother, Peggy McQuitty, to report and otherwise advise this Defendant of all medically significant developments in the condition of the Plaintiff's mother, Peggy McQuitty, and/or the Plaintiff, Dylan McQuitty; and

j. Being otherwise careless and negligent.

The McQuittys asserted the following in support of their informed consent claim:

27. The Defendant, Donald Spangler, M.D., owed to the Plaintiff the duty of appropriate notification to the Plaintiff's mother, Peggy McQuitty, of the various alternatives and risks involved in various modalities of treatment.

28. The Defendant, Donald Spangler, M.D., failed adequately obtain an informed consent from the Plaintiff's mother, Peggy McQuitty, and was otherwise negligent.

29. As a result of the negligence of the Defendant, Donald Spangler, M.D., his agents, servants and/or employees, the Plaintiff, Dylan McQuitty, experienced a severe shock to his nerves and nervous system, pain, and mental anguish. As a direct result thereof, the Plaintiff underwent surgery and unnecessary procedures, and he has been and will continue to be obliged to receive hospital and medical care; he has been and will continue to be prevented from engaging in his usual activities, duties and pursuits; and he has incurred and will continue to incur medical expenses in the future, and has been otherwise injured and damaged.

30. The Plaintiff further alleges that the parents of the minor Plaintiff are financially unable to provide for the past and future medical care and treatment that the minor Plaintiff requires as a direct and proximate result of the negligence of the Defendant, his agents, servants and/or employees.

31. All of these injuries and damages were caused by the negligence of the Defendant, Donald Spangler, M.D., individually, and through his agents, servants and/or employees, without any negligen[ce] on the part of the Plaintiff and/or his parents thereunto contributing.

A trial was held in April of 2004; the jury returned a verdict in favor of defendants, Dr. Spangler and Glowacki, Elberfeld & Spangler, P.A., on the medical malpractice count, but failed to reach a decision on the informed consent claim.

Two years later, a second trial took place solely on the issue of informed consent. Before trial, Dr. Spangler moved for summary judgment, raising, for the first time, the argument, which he has since maintained, that he had no duty to tell Mrs. McQuitty about the second partial-placental abruption, the intrauterine growth restriction, the option of an earlier Cesarean section, or the risks and alternative procedures associated therewith, because he initially obtained her informed con-

sent to treatment, that being to prolong the pregnancy, and thereby had no duty to obtain her informed consent to anything other than that which involved a proposed or actual "affirmative invasion of her physical integrity"; the judge denied the motion. During trial, Dr. Spangler reiterated his position on informed consent in his motion for directed verdict:

> In this case, Your Honor clearly, there was no proposed treatment which would have violated the physical integrity of Mrs. McQuitty. This was a decision solely to prolong the pregnancy.... [B]ased on a long line of Maryland law ... unless there's some proposed treatment which would violate the physical integrity of the patient, informed consent doesn't apply, and the issue is to judge whether a breach of the professional standard of care occurred or not.

In response to that motion, Mrs. McQuitty asserted that Dr. Spangler had an obligation to inform her of material information regarding her ongoing treatment in the hospital, pursuant to our holding in *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977), and alternatively, that even if an affirmative physical invasion were legally required, that she had met her burden of proof with evidence of a planned Cesarean section. The trial judge took the parties' arguments under advisement and reserved ruling.

During the discussion regarding jury instructions, the McQuittys requested Maryland Civil Pattern Jury Instruction 27:4, which states that:

> Before a physician provides medical treatment to a patient, the physician is required to explain the treatment to the patient and to warn of any material risks or dangers of the treatment, so that the patient can make an intelligent and informed decision about whether or not to go forward with the proposed treatment. This is known as the doctrine of informed consent.
>
> In fulfilling the duty to disclose, the physician is required to reveal to the patient the nature of the ailment, the nature of the proposed treatment, the probability of success of the proposed treatment and any alternatives, and the material

risks of unfortunate outcomes associated with such treatment.

A "material risk" is defined as "a risk which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to have the particular medical treatment or procedure."

The physician's duty to disclose material risks to the patient is based upon an objective standard rather than a subjective standard. This means that the question of whether a risk is a "material risk" is based upon whether a reasonable person in the position of the patient would have considered the risk to be a material risk. Whether the patient would have consented to the procedure, if informed of the risk, is a relevant factor to be considered, but is not conclusive. The physician is not required to divulge all risks, but only those which are material to the intelligent decision of a reasonably prudent patient.

Dr. Spangler asserted the need for two additional instructions aimed specifically at the issue of "whether there was an affirmative violation of Mrs. McQuitty's physical integrity." The judge denied Dr. Spangler's motion and gave the Pattern Jury Instruction.

The jury returned a verdict in favor of the McQuittys on behalf of Dylan in the amount of $13,078,515.00, of which $156,000.00 was attributed to past medical expenses and costs, while $8,422,515.00 was for future medical and rehabilitation care and costs, $1,000,000.00 was for loss of future earning capacity, and $3,500,000.00 was attributed to past and future physical and emotional pain and suffering and loss of enjoyment of life.

Dr. Spangler thereupon moved for judgment notwithstanding the verdict, raising the same arguments as mustered in his motion for summary judgment and directed verdict, and for remittitur. In a written opinion, the judge granted Dr. Spangler's motion, concluding that there was "no rational ground upon which a verdict can be maintained" because there was no "affirmative violation of Mrs. McQuitty's physical integrity":

[I]t is well established in Maryland that the doctrine of informed consent pertains only to affirmative violations of the patient's physical integrity. *Landon v. Zorn*, 389 Md. 206, 230, 884 A.2d 142 (2005); *see also Reed v. Campagnolo*, 332 Md. 226, 242–43, 630 A.2d 1145 (1993); *Arrabal v. Crew–Taylor*, 159 Md.App. 668, 684, 862 A.2d 431 (2004). Although the pattern jury instructions on informed consent uses the general term, "treatment," Maryland courts have consistently limited the doctrine to actual violations of the patient's bodily integrity—most commonly surgical procedures and injections. *See* MPJI–Cv 27:4 (2006); *compare Sard*, 281 Md. 432, 379 A.2d 1014 (bilateral tubal ligation failed to prevent conception) *and Goldberg v. Boone*, 396 Md. 94, 912 A.2d 698 (2006) (during a revisionary mastoidectomy, an inexperienced physician accidentally punctured his patient's brain) *with Landon*, 389 Md. 206, 884 A.2d 142 (doctrine inapplicable when a doctor did not recommend a diagnostic test for flesh-eating bacteria); *Reed*, 332 Md. 226, 630 A.2d 1145 (same result when doctor did not offer a test for birth defects); *and Arrabal*, 159 Md.App. 668, 862 A.2d 431 (same result when doctor did not offer an emergency Cesarean section after detecting fetal distress). In addition, to sustain a claim for lack of informed consent, the patient's injuries must have arisen out of the affirmative violation. *Landon*, 389 Md. at 230, 884 A.2d 142. To allow otherwise would severely encumber the physician-patient relationship, cause unnecessary hardship to medical practitioners, and create a profound overlap with the scope of professional negligence.

The McQuittys appealed to the Court of Special Appeals, reiterating the same arguments that they raised at trial. A panel, in an unreported opinion, affirmed the order granting judgment notwithstanding the verdict, holding, as the lower court did, that pursuit of a claimed violation of the doctrine of informed consent could provide no relief for the McQuittys in the absence of an "affirmative violation of the patient's physical integrity":

In the case *sub judice,* it was undisputed that the injury suffered by Dylan arose not from an affirmative violation of Mrs. McQuitty's physical integrity, but arose, instead, from the "complete abruption which occurred on May 8, 1995." In other words, according to evidence introduced by the plaintiffs, the injury occurred because Dr. Spangler failed to timely perform a Cesarean section; the harm caused to Dylan was not due to any operation or any other affirmative violation of the patient's physical integrity on Dr. Spangler's part.

### III. Discussion

The McQuittys, citing our seminal case of *Sard v. Hardy,* 281 Md. at 432, 379 A.2d at 1014, argue that it is well established that an informed consent claim is separate from that for medical malpractice, and that "artificial restriction[s] borrowed from the law of battery," such as the requirement of an "affirmative invasion of the physical integrity of the patient," have no place in the doctrine of informed consent, as defined in *Sard.* To this end, the McQuittys argue that Mrs. McQuitty and Dylan were receiving ongoing treatment from Dr. Spangler during the period in which Mrs. McQuitty was admitted to the hospital and placed on bed rest, and that Dr. Spangler had a "continuing duty to inform Mrs. McQuitty of material changes in her condition or that of her baby," as well as risks and alternative treatments associated therewith, material to Mrs. McQuitty's decision-making regarding whether to continue a preestablished course of treatment. Mrs. McQuitty alternatively asserts that were this Court to require proof of an affirmative physical invasion, that requirement was met by her treatment plan established after the first partial-placental abruption, which consisted of hospitalization; intravenous access for the administration of fluids and medications; serial injections of Betamethasone, a corticosteroid, and other medications; the insertion of a urethral foley catheter for urine collection and analysis; and the performance of serial blood extractions for hematologic studies.

18

Dr. Spangler counters that in *Landon v. Zorn*, 389 Md. 206, 230, 884 A.2d 142, 156 (2005), and *Reed v. Campagnolo*, 332 Md. 226, 242, 630 A.2d 1145, 1153 (1993), we determined that the duty to obtain informed consent arises only when a medical treatment or procedure has been proposed by a physician involving an "affirmative violation of the patient's physical integrity." He points out that he never proposed that Mrs. McQuitty undergo a Cesarean section prior to May 8, 1995, when it became medically indicated.

Breach of informed consent and medical malpractice claims both sound in negligence, but are separate, disparate theories of liability. *See, e.g., Landon*, 389 Md. at 230, 884 A.2d at 156 (upholding a trial judge's decision to instruct the jury on a medical malpractice theory of liability, but not on an informed consent theory); *Reed*, 332 Md. at 240–41, 630 A.2d at 1152–53 (holding that a failure to recommend a diagnostic procedure is properly an allegation of medical malpractice, not one of breach of informed consent); *Faya v. Almaraz*, 329 Md. 435, 447–51, 620 A.2d 327, 333–35 (1993) (holding that patients stated a proper cause of action sounding in negligence when they alleged that the physician breached a duty to obtain their informed consent by failing to inform them that he was infected with the AIDS virus before operating, without alleging that physician breached the standard of care in performing the procedure); *see also Zeller v. Greater Baltimore Medical Center*, 67 Md.App. 75, 81–82, 506 A.2d 646, 650 (1986) ("The rendering of medical services absent informed consent, if pled properly, constitutes a separate and new count of negligence."). In a count alleging medical malpractice, a patient asserts that a healthcare provider breached a duty to exercise ordinary medical care and skill based upon the standard of care in the profession, *see, e.g., Dehn v. Edgecombe*, 384 Md. 606, 618, 865 A.2d 603, 610 (2005) ("Medical malpractice is predicated upon the failure to exercise requisite medical skill and, being tortious in nature, general rules of negligence usually apply in determining liability.") (internal quotations and citations omitted), while in a breach of informed consent count, a patient complains that a healthcare provider breached

a duty to obtain effective consent to a treatment or procedure by failing to divulge information that would be material to his/her decision about whether to submit to, or to continue with, that treatment or procedure. *See Sard,* 281 Md. at 444, 379 A.2d at 1022.

Our first holding regarding a physician's duty to provide a patient with information to enable the patient's choice about whether to submit to a particular therapy or procedure was in *Sard,* 281 Md. at 432, 379 A.2d at 1014. In that case, Mrs. Sard had consented in writing to a sterilization procedure, concurrent with a Cesarean section delivery of her second child. Without discussing alternative sterilization methods or that there was a higher, 2% failure-rate associated with a tubal ligation when performed during a Cesarean section, Dr. Hardy unilaterally decided to perform, and did perform, a tubal ligation. The tubal ligation was unsuccessful; Mrs. Sard became pregnant with another child and instituted suit, alleging that Dr. Hardy "negligently failed to advise [the Sards] that the surgical procedure employed by him was not absolutely certain to succeed and that [he] failed to apprise the Sards of the potential results of the operation and alternative methods of sterilization, thereby precluding [them] from giving their informed consent." *Id.* at 435, 379 A.2d at 1017. At the close of the Sard's case, the judge directed a verdict, holding that Mrs. Sard's written consent to the operation was dispositive. The Sards appealed to the Court of Special Appeals, which held that the physician had a "duty ... to make an adequate disclosure of substantial facts which would be material to the patient's decision," but, nevertheless, affirmed the judgment because the 2% risk of failure was not considered a material risk. *Sard v. Hardy,* 34 Md.App. 217, 231, 367 A.2d 525, 533 (1976).

We granted certiorari and reversed, holding that consent must be "informed" to be effective, *id.* at 439, 379 A.2d at 1019–20, and that under the informed consent doctrine, a healthcare provider has a duty to provide a patient with all information material to the patient's assessment about whether to submit to a particular therapy or procedure. *Id.* at 444,

379 A.2d at 1019–20. We began our analysis by recognizing that the requirement that consent be "informed" is derived from the "universally" recognized common law rule that a healthcare provider obtain a patient's consent to treatment:

> The doctrine of informed consent, which we shall apply here, follows logically from the universally recognized rule that a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient.

*Id.* at 438–39, 379 A.2d at 1019. We recognized that the obligation to obtain consent evolved over the course of the twentieth century into an obligation to obtain "informed" consent, primarily to enable the patient to make an informed choice about a particular therapy or procedure so that healthcare providers did not substitute their own judgment for that of the patient's:

> The law does not allow a physician to substitute his judgment for that of the patient in the matter of consent to treatment.

*See Sard,* at 340, 379 A.2d at 1020, citing *Collins v. Itoh,* 160 Mont. 461, 503 P.2d 36, 40 (1972) ("The law will not allow a physician to substitute his own judgment, no matter how well founded, for that of his patient."). Thus, we recognized that personal autonomy and personal choice were the primary foundations of the informed consent doctrine.

In explicating the boundaries of the duty of informed consent, we began with the doctrine's "general principles." Importantly, we acknowledged that the duty to provide information extended not only to a patient's ailment or condition, but also to "the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives, and the risk of unfortunate consequences associated with such treatment":

> Simply stated, the doctrine of informed consent imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and

to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment. *Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees,* 154 Cal.App.2d 560, 317 P.2d 170, 181 (1957); *Bang v. Charles T. Miller Hospital,* 251 Minn. 427, 88 N.W.2d 186, 190 (1958); *Scaria v. St. Paul Fire & Marine Ins. Co.,* 68 Wis.2d 1, 227 N.W.2d 647, 654 (1975). *This duty to disclose is said to require a physician to reveal to his patient the nature of the ailment, the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives, and the risk of unfortunate consequences associated with such treatment. Natanson v. Kline,* 186 Kan. 393, 350 P.2d 1093, 1106, *rehearing denied,* 187 Kan. 186, 354 P.2d 670 (1960); *Scaria v. St. Paul Fire & Marine Ins. Co.,* 227 N.W.2d at 653; 2 D. Louisell & H. Williams, *Medical Malpractice* ¶ 22.01 (1973).

*Id.* at 439–40, 379 A.2d at 1020 (emphasis added). We admonished, however, that a healthcare provider "is not burdened with the duty of divulging *all* risks, but only those which are material to the intelligent decision of a reasonably prudent patient." *Id.* at 444, 379 A.2d at 1022 (emphasis in original). In so stating, we adopted a "general or lay standard of reasonableness," under which "the scope of the physician's duty to inform is to be measured by the materiality of the information to the decision of the patient." *Id.* We defined material information as information "which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure." *Id.* We explained that the "materiality test" was the best measure of a healthcare provider's duty to provide information, because, "[b]y focusing on the patient's need to obtain information . . . the materiality test promotes the paramount purpose of the informed consent doctrine—*to vindicate the patient's right to determine what shall be done with his own body and when.*" *Id.* (emphasis added). Applying these standards, we ultimately held that Mrs. Sard had stated a viable cause of action for

breach of informed consent, and that it was for the jury to determine whether a two-percent risk of a failed sterilization procedure was a material risk.

■ The gravamen of an informed consent claim, therefore, is a healthcare provider's duty to communicate information to enable a patient to make an intelligent and informed choice, after full and frank disclosure of material risk information and the benefit of data regarding a proposed course of medical treatment. *Sard* did not limit a healthcare provider's duty to disclose material information to the type of proposed treatment: i.e., whether the proposed treatment or therapy was or was not surgical or physically invasive in nature. *See id.* at 440, 379 A.2d at 1020 ("This duty [of informed consent] is said to require a physician to reveal to his patient the nature of the ailment, the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives, and the risk of unfortunate consequences associated with such treatment.").

What has confused the understanding of the doctrine of informed consent, nevertheless, is the apparent introduction of a physical invasion requirement in *Reed,* 332 Md. at 242–43, 630 A.2d at 1153. In that case, when attempting to distinguish a failure to recommend or instruct about a diagnostic procedure from a failure to obtain informed consent, we cited the New York case of *Karlsons v. Guerinot,* 57 A.D.2d 73, 394 N.Y.S.2d 933 (N.Y.App.Div.1977). In so doing, we shifted the focus of the doctrine of informed consent from a healthcare provider's duty to divulge material information to a patient to the act undertaken by the provider.

In *Reed,* a mother brought wrongful birth and breach of informed consent actions against her physician in federal district court, alleging that her physician failed to diagnose the possibility of neural tube defects *in utero,* which are genetically caused; that her child was born with deformities as a result of the defects; and that she would have had an abortion had she known of the *in utero* condition. Two certified questions

were forwarded to us,[7] the second of which pertained to informed consent: [8]

> "ii. Whether the continuation of a pregnancy is a decision requiring the informed consent of the patient which can give rise to a Maryland tort cause of action for lack of informed consent when the allegedly negligent course of treatment is the defendant physician's failure to inform a pregnant patient about the availability, risks and benefits of diagnostic testing which might reveal birth defects, and failure to inform the patient about the benefits and risks associated with aborting a severely deformed fetus."

*Id.* at 228, 630 A.2d at 1146, quoting *Reed v. Campagnolo*, 810 F.Supp. 167, 172–73 (D.Md.1993). We answered that "informed consent must be to some treatment," and that because here, "the defendants never proposed that the tests be done," the "defendants . . . duty to offer or recommend the tests [had to be] analyzed in relation to the professional standard of care." *Id.* at 241, 630 A.2d at 1152.

In attempting to elucidate the distinction between informing a patient about a proposed treatment, implicating the doctrine of informed consent, and failing to recommend a diagnostic test, implicating a medical malpractice claim, we cited *Karl-*

---

7. The certified questions were reviewed pursuant to Sections 12–601 through 12–609 of the Courts and Judicial Proceedings Article, Maryland Code (1974, 1989 Repl.Vol.), under the Maryland Uniform Certification of Questions of Law Act.

8. The Reeds specifically alleged that Dr. Campagnolo failed to inform them about possible diagnostic tests that were available to them:

> "[D]efendants failed in the course of pre-natal care to 'inform plaintiffs of the existence or need for routine [*a*-fetoprotein] ("AFP") testing of maternal serum to detect serious birth defects such as spina bifida and imperforate anus.' Had they been informed about AFP testing they would have requested it. Had such testing been done, it would have revealed elevated protein levels, indicative of an abnormal fetus, which would have led plaintiffs to request amniocentesis. Amniocentesis, claim plaintiffs, would have revealed the extent of the fetus's defects and plaintiffs ultimately would have chosen to terminate the pregnancy."

*Reed v. Campagnolo*, 332 Md. 226, 229, 630 A.2d at 1146 (1993), quoting *Reed v. Campagnolo*, 810 F.Supp. 167, 169 (D.Md.1993).

*sons,* 57 A.D.2d at 73, 394 N.Y.S.2d 933, in which the New York intermediate appellate court stated that an informed consent claim could not lie absent "an affirmative violation of the patient's physical integrity":

"[A] cause of action based upon [the doctrine of informed consent] exists only where the injury suffered arises from an affirmative violation of the patient's physical integrity and, where nondisclosure of risks is concerned, these risks are directly related to such affirmative treatment. Here, the resultant harm did not arise out of any affirmative violation of the mother's physical integrity. Furthermore, the alleged undisclosed risks did not relate to any affirmative treatment but rather to the condition of pregnancy itself. Allegations such as these have traditionally formed the basis of actions in medical malpractice and not informed consent."

*Id.* at 242–43, 630 A.2d at 1153, quoting *Karlsons,* 57 A.D.2d at 82, 394 N.Y.S.2d 933 (internal citations omitted). *Karlsons'* articulation of an affirmative physical invasion requirement was premised upon the understanding that an informed consent claim sounded in assault or battery, rather than negligence:

The cause of action is not based on any theory of negligence but is an offshoot of the law of assault and battery. Any nonconsensual touching of a patient's body, absent an emergency, is a battery and the theory is that an uninformed consent to surgery obtained from a patient lacking knowledge of the dangers inherent in the procedure is no consent at all.

*Karlsons,* 57 A.D.2d at 81–82, 394 N.Y.S.2d 933.[9]

From a practical standpoint, the conduct of the parties should be measured by a negligence analysis in both "informed consent" and "negligent" malpractice actions.

9. Within three years of the decision in *Karlsons,* the same New York appellate court, without referring to *Karlsons,* held that an informed consent claim is predicated on negligence rather than on battery or assault. In *Dries v. Gregor,* 72 A.D.2d 231, 234–36, 424 N.Y.S.2d 561

In *Reed*, however, we ultimately concluded, after citing, but not relying on *Karlsons*, that a failure to offer or recommend diagnostic tests should be analyzed under a healthcare provider's duty to provide an acceptable standard of care, not under a duty to obtain informed consent:

Whether the defendants had a duty to offer or recommend the tests is analyzed in relation to the professional standard

---

(N.Y.App.Div.1980), the court acknowledged that consent actions at common law could lie both in battery (trespass *vi et armis*) and in negligence (trespass on the case), and that modern claims involving informed consent, absent the performance of an invasive procedure wholly without a patient's consent, are actions sounding in negligence:

The theory of lack of informed consent in medical malpractice actions presents conceptual difficulties arising from the awkward mixture of assault and battery in a suit based upon negligence. A brief look at their ancestry clarifies their differences. Assault and battery is a descendant of the early English common-law action of trespass. Negligence, on the other hand, traces its ancestry back to another ancient common-law writ titled an action of trespass on the case. Originally they were related to each other. The older action of trespass developed new variations which became separate forms of action. One variety was "upon a special case" or, later, simply "trespass on the case." (Plucknett, A Concise History of the Common Law [2d ed.], pp. 335, 336.). Trespass was the remedy for direct injuries and trespass on the case for indirect injuries. These common-law actions have now been abandoned in modern practice, particularly the artificial classification of injuries as direct or indirect. The law today looks instead to the intent of the wrongdoer or to his negligence. In their evolution the action of trespass remained as the remedy for all intentional wrongs and action on the case was extended to include injuries which were not intended but were merely negligently inflicted (Prosser, Law of Torts [4th ed.], § 7, p. 28). Trespass on the case ... had become distinct from trespass by 1390, and as early as the 16th century had evolved as the remedy for libel and slander, negligence and deceit (Plucknett, A Concise History of the Common Law [2d ed.], p. 336). Battery remains by definition an intentional tort, just as its progenitor trespass.

\* \* \*

Negligence as the direct descendant of trespass on the case has a different conceptual basis than battery because negligence includes those unintended wrongs which one actor causes to another.

\* \* \*

*Id.* at 234–36, 424 N.Y.S.2d 561.

Recently, the New York intermediate appellate court seemingly permitted an informed consent claim to be pursued that was not premised on a surgical procedure. *See Cicione v. Meyer,* 33 A.D.3d 646, 823 N.Y.S.2d 173 (N.Y.App.Div.2006).

of care. Application of that standard may or may not produce a result identical with the informed consent criterion of what reasonable persons, in the same circumstances as the Reeds, would want to know.

*Id.* at 241, 630 A.2d at 1152–53. Physical invasion was not articulated as a basis.

Our citation to *Karlsons* in *Reed* has been viewed as introducing an element of affirmative physical invasion or battery into an informed consent doctrine predicated on negligence in a few subsequent decisions. *See, e.g., Landon,* 389 Md. at 230–31, 884 A.2d at 156 (holding that trial judge properly denied a request for a jury instruction on informed consent, because prescribing a CAT scan did not involve an affirmative violation of the patient's physical integrity); *Arrabal v. Crew–Taylor,* 159 Md.App. 668, 862 A.2d 431 (2004) (applying the physical invasion standard when holding that an informed consent action could not lie).

Viewed with the benefit of hindsight, our reference to *Karlsons* deviated from our common law roots, as well as from cases in which we have explicitly stated that an allegation of lack of informed consent sounds in negligence, as opposed to battery or assault, in direct contravention to *Karlsons.* In this regard, the case of *Slater v. Baker & Stapleton,* 95 Eng. Reports 860 (K.B.1767), which has been incorporated into the common law of this state under Article V of the Maryland Constitution Declaration of Rights,[10] illustrates that, as early as 1767, an action for lack of consent could be pled on the case, the precursor to negligence, as opposed to trespass *vi et armis* or battery.[11] *See* Black's Law Dictionary 1542 (18th ed. 2004)

---

10. Article V of the Maryland Declaration of Rights, states, in pertinent part that, "the Inhabitants of Maryland are entitled to the Common Law of England ... according to the course of that Law, and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six."

11. We recently discussed the historical change from pleading in form to fact-based pleading in *Khalifa v. Shannon,* 404 Md. 107, 128–29, 945 A.2d 1244, 1256–57 (2008) ("When pleading was by form rather than

(Trespass on the case "was the precursor to a variety of modern-day tort claims, including negligence. . . ."); 1 John P. Poe, Pleading and Practice in Courts of Common Law 154–55 (3rd ed. 1897); *see also* Paul Mark Sandler & James K. Archibald, Pleading Causes of Action in Maryland, at Prologue xx (3rd ed.2004) (same). In *Slater*, Slater brought an action against Baker, the surgeon, and Stapleton, the apothecary, as a special action upon the case, alleging that they treated his broken leg with an experimental device, to which he did not consent. After Slater was awarded damages by a jury, Baker and Stapleton argued before the King's Bench that Slater's award of damages could not stand because Slater had not pled his action correctly: i.e., he should have pled it as a trespass *vi et armis* or battery rather than as a special action on the case or negligence. In a per curiam opinion, the King's Bench disagreed, holding that a lack of consent claim could be brought as a special action upon the case. In so holding, the

---

by fact, a cause of action had to be alleged within the narrow constructs of predefined pleadings forms."), and *Ver Brycke v. Ver Brycke*, 379 Md. 669, 696, 843 A.2d 758, 773 (2004) ("We repeatedly have stated that the strictures of common law pleading, whereby the causes of action pled define the action, have been replaced by fact-based pleading so that remedies sought serve to delineate the type of action, whether it be in law or equity.").

In *Khalifa*, 404 Md. at 128–29, 945 A.2d at 1256–57 (2008), we also distinguished actions on the case from actions trespass *vi et armis*, quoting the following passage from 1 John P. Poe, Pleading and Practice in Courts of Common Law 115 (5th ed.1925) (italics in original):

Trespass [vi et armis] lies to recover *damages* for an injury committed with force, either actual or implied by law, where the injury is direct and immediate, and where it is committed either upon the person of the plaintiff, or upon his tangible and corporeal property, whether real or personal. Case, on the other hand, lies to recover *damages* for any wrong or cause of complaint to which covenant, assumpsit or trespass will not apply. Or to adopt another definition, more sharply contrasting it with trespass, it lies generally to recover damages for torts *not* committed with force, actual or implied; or, if committed with force, where the injury is not immediate but consequential; or, where the matter effected is not tangible. . . . An injury is considered immediate where it is occasioned by the act complained of itself, and not merely by a consequence of that act. In all other cases it is consequential.

court recognized that the gravamen of a lack of consent claim is a physician's duty, according to the "law of surgeons," to obtain a patient's consent to treatment:

> 2dly, it was objected that the evidence given does not apply to this action ... the evidence is, that the callous of the leg was broke without the plaintiff's consent; but there is no evidence of ignorance or want of skill, and therefore the action ought to have been trespass vi & armis for breaking the plaintiff's leg without his consent. All the surgeons said they never do any thing of this kind without consent,

> \*     \*     \*

> In answer to this, it appears from the evidence of the surgeons that it was improper to disunite the callous *without consent;* this *is the usage and law of surgeons:* then it was ignorance and unskilfulness in that very particular, *to do contrary to the rule of the profession, what no surgeon ought to have done; and indeed it is reasonable that a patient should be told what is about to be done to him, that he may take courage and put himself in such a situation as to enable him to undergo the operation.* It was objected, this verdict and recovery cannot be pleaded in [case] to an action of trespass vi & armis to be brought for the same damage; but we are clear of opinion it may be pleaded in [case].

*Id.* at 862 (emphasis added). Thus, Slater was permitted to pursue his lack of consent action against Baker and Stapleton as a special action upon the case.

In *Sard* and its progeny, moreover, we repeatedly and explicitly have held that lack of informed consent sounds in "negligence, as opposed to battery or assault." *Sard*, 281 Md. at 440 n. 4, 379 A.2d at 1020 n. 4 ("We note in passing our approval of the prevailing view that a cause of action under the informed consent doctrine is properly cast as a tort action for negligence, as opposed to battery or assault."). *See, e.g., Goldberg v. Boone,* 396 Md. 94, 122–27, 912 A.2d 698, 714–17 (2006) (holding that a trial judge was correct to permit a lack of informed consent instruction to go to the jury when evi-

dence was produced that the physician failed in his *duty to inform* patient that there were other more experienced surgeons that could perform the necessary procedure); *Mole v. Jutton*, 381 Md. 27, 47, 846 A.2d 1035, 1046–47 (2004); *Dingle v. Belin*, 358 Md. 354, 359, 749 A.2d 157, 159 (2000) (recognizing, in a case where a patient alleged that she did not consent to performance of gall bladder surgery by a resident physician, that a lack of informed consent action is negligence-based); *Wright v. Johns Hopkins Health Sys. Corp.*, 353 Md. 568, 595 n. 16, 728 A.2d 166, 179 n. 16 (1999) ("Wright's parents' cause of action for lack of informed consent is properly a cause of action for negligence."); *Faya*, 329 Md. at 435, 620 A.2d at 327.

In our recent case, *Mole v. Jutton*, 381 Md. at 45, 47, 846 A.2d at 1046–47, a patient brought an informed consent action against her surgeon, alleging negligence and battery, when her surgeon cut her milk ducts when removing two cysts in her breast. At the close of evidence, the trial judge instructed the jury regarding negligence, related to the doctor's failure to inform Ms. Mole of the risk of cutting the ducts, but refused to instruct on battery. The jury awarded Ms. Mole $22,500 in actual damages, but she, nevertheless, appealed, arguing that it was error for the trial judge to refuse to instruct on battery. We granted certiorari prior to any proceedings in the intermediate appellate court and affirmed. In so doing, we reemphasized that an informed consent action sounds in negligence, rather than in battery, and that a battery action is limited to certain circumstances:

> A claim under the informed consent doctrine must be pled as a tort action for negligence, rather than as one for battery or assault.

> \*    \*    \*

> "The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented.... However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a

low probability occurs, no intentional deviation from the consent given appears.... In that situation the action should be pleaded in negligence."

*Id.*, 381 Md. at 39, 47, 846 A.2d at 1042, 1046–47, quoting *Cobbs v. Grant*, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1, 8 (1972) (citations omitted).

In *Faya v. Almaraz*, 329 Md. at 435, 620 A.2d at 327, moreover, we elucidated that information provided to (or withheld from) a patient is the crux of an informed consent action and that the action is to be analyzed using the negligence rubric. In that case, Dr. Almaraz was infected with the AIDS virus and operated on numerous patients, including Ms. Faya, without disclosing that he was infected with the disease. Upon learning of Almaraz's condition, patients sued, alleging breach of informed consent, but the trial judge dismissed for failure to state a claim upon which relief could be granted. The patients appealed, and we granted certiorari prior to any proceedings in the Court of Special Appeals and reversed, holding that the patients had alleged sufficient facts to support a claim of negligence. In reaching this conclusion, we applied each element of the negligence four-part rubric to the plaintiffs' actions, *id.* at 448, 620 A.2d at 333 ("To state a cause of action in negligence, a plaintiff must allege that the defendant had a duty of care which he breached, and that the breach proximately caused legally cognizable injury"), and held that the patients validly had alleged facts to support a cause of action for breach of informed consent because they had asserted that Dr. Almaraz withheld information that was material to their assessments of the risks and benefits prior to his engaging in a treatment or a procedure. *See id.* at 450, 620 A.2d at 334. In so holding, we relied on *Sard* and were explicit that the patients' complaint was not that Dr. Almaraz had acted negligently when performing the operation, but that he was negligent in failing to provide them with information material to an effective risk-benefit analysis:

Thus, in evaluating the well-pleaded allegations of the complaints with respect to the duty component of the tort of negligence, we cannot conclude that they are legally insuffi-

cient to survive the appellees' motions to dismiss; in other words, we cannot say as a matter of law that no duty was imposed upon Dr. Almaraz to warn the appellants of his infected condition or refrain from operating upon them.[6]

6   We noted in *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977), that a surgeon has a legal duty, except in emergency circumstances, to obtain the "informed consent" of the patient before undertaking the surgical procedure. We said that the surgeon's duty is "to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment." *Id.* at 439, 379 A.2d 1014. We further said that the proper test for measuring a physician's duty to disclose risk information is whether such data would be material to the patient's decision. *Id.* at 443, 379 A.2d 1014. In this regard, we explained that "[a] material risk is one which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure." *Id.* at 444, 379 A.2d 1014.

The cause of action for lack of informed consent is one in tort for negligence, as opposed to battery or assault. *Id.* at 440 n. 4, 379 A.2d 1014.

*Id.* at 450 & n. 6, 620 A.2d at 334 & n. 6. Thus, the development of our jurisprudence has elucidated that a lack of informed consent claim is clearly predicated on negligence and the gravamen is the healthcare provider's duty to provide information, rather than battery or the provider's physical act.

Finally, requiring a physical invasion to sustain an informed consent claim contravenes the very foundation of the informed consent doctrine—to promote a patient's choice. In *Sard* we emphasized that, "the paramount purpose of the doctrine of informed consent [is] to vindicate the patient's right to determine what shall be done with [her] body and when," *Sard*, 281 Md. at 444, 379 A.2d at 1022, and that a healthcare provider's duty to obtain a patient's informed consent is "to enable ... the choice about whether or not to undergo ... *treatment.*" *Id.* at 440, 379 A.2d at 1020 (emphasis added). When describing the scope of that duty, we held that a healthcare provider has a duty to inform of those risks "which are material to the intelligent decision of a reasonably prudent patient." *Id.* at 444, 379 A.2d at 1022. In other contexts, we have spoken of a

patient's right to withdraw her consent to treatment at any time. *See Wright,* 353 Md. at 572, 728 A.2d at 168 ("Under Maryland common law, a competent adult has the right to refuse medical treatment and to withdraw consent to medical treatment once begun. . . . This right is a corollary to the common law doctrine of informed consent."). An affirmative physical invasion requirement countermands a patient's choice by permitting the healthcare provider to make treatment decisions, in lieu of patient involvement in the healthcare choice. This rationale also has been articulated by a New Jersey appellate court, when, in an informed consent case, it stated:

> Conventional medical judgments during the course of treatment remain for the physician to make, subject to ordinary malpractice controls. But determinations bearing upon which course of treatment to adopt are the capable patient's prerogative, assisted by as much information and advice as the physician may reasonably be able to furnish. This is especially so not only where considerations of medical risk and benefit are involved in the choice of treatment, but also where lifestyle choices and other considerations of personal autonomy are implicated. To the extent the physician has a view as to which of the reasonably available alternative courses of treatment is the best in the circumstances as a matter of medical judgment, the physician must also give the patient the benefit of a recommendation. There is no reasonable basis for the apprehension, as expressed by defendant in argument before the trial judge, that the physician will ever be required to perform surgery or administer any other course of treatment that he or she believes to be contraindicated. If the patient selects a course, even from among reasonable alternatives, which the physician regards as inappropriate or disagreeable, the physician is free to refuse to participate and to withdraw from the case upon providing reasonable assurances that basic treatment and care will continue. In such circumstances, there can be no liability for the refusal.

*Matthies v. Mastromonaco,* 310 N.J.Super. 572, 709 A.2d 238, 253 (1998).

■ In the present case, we are reviewing the grant of judgment notwithstanding the verdict premised upon the requirement of a physical invasion. We hold today that this is not a requirement to sustain an informed consent claim. As a result, the case will be remanded to the trial court for consideration of the remittitur motion filed by Dr. Spangler, which was not decided.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

Judge GREENE joins in the judgment only.